[L. A. No. 16102.   In Bank.—March 26, 1937.]

DICK R. PARSONS, Respondent, v. LEO FULLER, Appellant.

C. A. Pinkham and Schell & Delamer for Appellant.

Hedley Richmond and Welburn Mayock for Respondent.

CURTIS, J.—A transfer of this cause from the District Court of Appeal was ordered solely for the reason that there was a possible conflict between the opinion therein and the two cases of *McLeod* v. *Dutton,* 13 Cal. App. (2d) 545 [57 Pac. (2d) 189], and *Hall* v. *Mazzei,* 14 Cal. App. (2d) 48 [57 Pac. (2d) 948]. We have made a further study of those two cases, and conclude that neither of them conflicts with the opinion of the District Court of Appeal in the present cause. In each of those cases it was sought to hold the driver of the car for injury to a guest riding with the driver. In the case of *McLeod* v. *Dutton, supra,* the driver of a Cord car had been racing with a Packard car shortly before he

collided with a Dodge car in which collision the guest was injured. He had passed the Packard, and had turned into the right or north lane of the highway in front of the Packard when he collided with a Dodge car that was attempting to cross the highway in front of him. When the front half of the Dodge car was on the north side of the white line and the rear half was on the south side of the white line, the Cord car came forward and attempted to pass on the north side, but failed in the attempt, and the collision occurred. The facts presented a clear case of negligence, but as the opinion therein held, the acts of the driver did not constitute wilful misconduct.

In the case of *Hall* v. *Mazzei, supra,* the driver of the car was attempting to tighten the windshield of the car which had become loose and at the same time was driving her car at a speed of forty-five miles per hour with one hand. The guest protested at the rate of speed at which the car was traveling at the time of the tightening of the windshield. During this time, a Ford coupe passed the car in which the guest and driver were riding, and was between three and four hundred feet in front of them when the driver finished fixing the windshield. The driver then increased the speed of her car, and attempted to pass the Ford coupe in front of her. In doing so, she overturned her own car with the result that she was killed and her guest was injured. The guest testified that the car in which she was riding was traveling sixty miles an hour at the time the driver attempted to pass the Ford coupe. She also stated that she said to the driver when they were attempting to pass the Ford coupe, ''Let's not try to pass it,'' but the latter only laughed and kept on. In affirming the judgment in favor of the defendant, the court stated that the operation of adjusting the windshield had been completed at a considerable distance from the place of the accident; that there were soft shoulders on both sides of the pavement, but the pavement was of sufficient width to permit the deceased to drive her car at a speed of even sixty miles an hour and safely pass the other car without serious danger of leaving the pavement. While it was carelessness for her to permit her car to leave the pavement, there was nothing to indicate that such an act was the result of anything more than negligence and that, ''It was a momentary lapse in the exercise of care that had disastrous re-

sults and caused her death and the serious injury of her friend.''

A reading of the present opinion of the District Court of Appeal we think will show an entirely different course of conduct on the part of the defendant in this case and that his acts, persisted in for some hours and over many miles of travel, after repeated protests on the part of his guest, and while they were traveling over a mountain road with frequent curves and at an excessive rate of speed, compel the conclusion that he was guilty of wilful misconduct within the settled meaning of that term as defined by the authorities, many of which are cited in said opinion. We, therefore, adopt the opinion of the District Court of Appeal, prepared by Justice *Pro Tempore* Desmond as the opinion of this court. It is as follows:

''Upon the ground of insufficiency of the evidence, defendant appeals from a judgment awarding damages to plaintiff in a jury-waived trial.

''Defendant, accompanied by plaintiff as his guest, started in his automobile for Boulder dam, leaving Los Angeles in the morning of November 29, 1934. They were accompanied by a man named Liston and after a little while by an unknown 'hitch-hiker'. Defendant traveled at a speed ranging as high as 65 miles per hour between Los Angeles and Ontario, where the party stopped for breakfast. Plaintiff complained of this fast driving before they left Los Angeles. 'I noticed how fast he was going and I told him, I said, ''Don't go too fast. This is a pleasure trip. It makes me nervous. I would appreciate it if you drove slower.'' He said, ''I am going to, Dick. I am not going to drive very fast.'' I said, ''That is fine and dandy,'' but he continued doing it.' After breakfasting in Ontario, 'I came out of the restaurant to get back in the car and I said, ''Leo,'' I said ''you are driving too fast. It makes me nervous. I am not enjoying the trip. I would rather go back to Los Angeles than go so fast, but if you will drive slower everything will be fine.'' I said, ''When I left home I told you I wouldn't go over 45.'' I said, ''I won't complain at 45, but anything over that speed makes me too nervous.'' He said, ''I won't go over 45.'' '

''Notwithstanding this promise on the part of the defendant, he continued to drive thereafter occasionally at a speed estimated by plaintiff as 65 miles per hour, and at 60 miles

per hour, according to his own admission. Plaintiff testified that he protested several times and finally, when nearing the summit of the grade extending through Cajon Pass, saw a sign 4 feet by 4 feet in the highway approximately one-fourth to one-half mile ahead. At that time, plaintiff testified, defendant was traveling about 65 miles per hour.

" 'Q. Did you or did you not call attention—call Mr. Fuller's attention to the sign at that time? A. I did. Q. What, if anything, did you say to him? A. I noticed the speed he was going. I could see the speedometer. I said, "Leo, you are going too fast." I said, "You see that sign down the road?" He said, "Yes." I said, "For God's sake, get over to this side of the line. You won't make the turn." He said, "Everything will be all right." Q. From that time on did he increase or decrease the speed of this car? A. Increased it. Q. At the time you brought the sign to his attention was he traveling on the righthand or lefthand side of the pavement? A. He was straddling the white line down the center of the boulevard. Q. From the time that you brought it to his attention and he stated he would and everything was going to be all right and speeded up, will you describe what occurred from that time on to the accident? A. Well, at the time I called his attention to the sign, the way I recollect it, it was only a few seconds until he was at the sign. To keep from running over the sign he guided his car to the right and the front wheels over onto the gravel on the side of the road and he started to skid and he turned loose of the steering wheel and threw both arms that way (indicating) locked around his head, and Mr. Liston did the same thing, and the man in the back seat with me did the same thing, and we went over the bank, and that is about all I know. Q. At the time you brought the sign to his attention you were driving some 60 miles an hour or better to the time you approached the sign and he endeavored to whip around it, did he increase his speed? A. Increased.' There was no contradiction of this testimony, except that defendant estimated that he dropped his speed from about 60 miles per hour to between 45 and 50 miles per hour. Mr. Liston testified that he continued at 'Practically the same speed. He didn't slow down when Parsons told him about the sign, he kept on going. . . . Well, we come around that sign and hit that soft gravel, the car glided right out through the country, and a fellow told me it turned over four times.

The Court: No. Just what you recall. Q. By Mr. Mayock: You remember you glided out through the country and through the air? A. Well, through the air, through the air, and after the first hit I don't know any more. Q. Did you examine afterwards where the first—where the car hit the first time after leaving the highway? A. 60 feet down. Q. It came to a complete stop how far down? A. Approximately 85 feet.'

"Upon these facts appellant contends that the court was not warranted in finding that the injuries suffered by respondent were proximately caused by the wilful misconduct of appellant. Under section 141¾ of the California Vehicle Act, as enacted in 1929, recovery might be had for injury or death proximately resulting to a guest passenger 'from the intoxication, wilful misconduct or gross negligence of such owner, driver or person responsible for the operation of such vehicle'. The legislature of 1931 amended this section by striking out the words 'or gross negligence', and since then the courts have been called upon frequently to determine where the dividing line lies between wilful misconduct and gross negligence. (*Meek* v. *Fowler*, 3 Cal. (2d) 420 [45 Pac. (2d) 194]; *Howard* v. *Howard*, 132 Cal. App. 124 [22 Pac. (2d) 279]; *Walker* v. *Bacon*, 132 Cal. App. 625 [23 Pac. (2d) 520]; *Turner* v. *Standard Oil Co.*, 134 Cal. App. 622 [25 Pac. (2d) 988]; *Sanchez* v. *Rissen*, 12 Cal. App. (2d) 152 [55 Pac. (2d) 292]; *Candini* v. *Hiatt*, 9 Cal. App. (2d) 679 [50 Pac. (2d) 843]; *Lennon* v. *Woodbury*, 3 Cal. App. (2d) 595 [40 Pac. (2d) 292].) All these cases, and others bearing on the same question, we have read, including the recent cases cited by appellant in his reply brief: *Weir* v. *Lukes*, 13 Cal. App. (2d) 312 [56 Pac. (2d) 987], *Bartlett* v. *Jackson*, 13 Cal. App. (2d) 435 [56 Pac. (2d) 1298], *McLeod* v. *Dutton*, 13 Cal. App. (2d) 545 [57 Pac. (2d) 189], *Horn* v. *Volko*, 13 Cal. App. (2d) 582 [57 Pac. (2d) 175], and *Hall* v. *Mazzei*, 14 Cal. App. (2d) 48 [57 Pac. (2d) 948].

"It is unnecessary, for present purposes, to attempt to summarize these opinions or to differentiate one from the others; rather we shall refer to the language in *Sanford* v. *Grady*, 1 Cal. App. (2d) 365, at 371 [36 Pac. (2d) 652, 37 Pac. (2d) 475], as sufficiently justifying the court's finding in the instant case.

" 'Wilful misconduct is defined in the case of *Norton* v. *Puter,* 138 Cal. App. 253 [32 Pac. (2d) 172], in which case a hearing was denied by the Supreme Court, as follows:

" ' "Wilful misconduct depends upon the facts of a particular case, and necessarily involves deliberate, intentional, *or wanton* conduct in doing or omitting to perform acts, with knowledge or appreciation of the fact, on the part of the culpable person, *that danger is likely to result therefrom.* (*Helme* v. *Great Western Milling Co.,* 43 Cal. App. 416 [185 Pac. 510] ; *Olson* v. *Gay,* 135 Cal. App. 726 [27 Pac. (2d) 922] ; *Walker* v. *Bacon,* 132 Cal. App. 625 [23 Pac. (2d) 520] ; *Howard* v. *Howard,* 132 Cal. App. 124 [22 Pac. (2d) 279].) Webster's New International Dictionary, page 1379, defines 'misconduct' as 'wrong or improper conduct; bad behavior; unlawful behavior or conduct, malfeasance'. (40 C. J., p. 1221.) Wilfulness necessarily involves the performance of a deliberate or intentional act or omission regardless of the consequences. In *Helme* v. *Great Western Milling Co., supra,* it is said:

" ' " "Wilful misconduct" means something different from and more than negligence, however gross. The term "serious and wilful misconduct" is described by the Supreme Judicial Court of Massachusetts as being something "much more than mere negligence, or even gross or culpable negligence" and as involving "conduct of a *quasi* criminal nature, the intentional doing of something either with the knowledge that it is likely to result in serious injury or with a wanton and reckless disregard of its possible consequences". (*In re Burns,* 218 Mass. 8 [Ann. Cas. 1916A, 787, 105 N. E. 601].) The mere failure to perform a statutory duty is not alone, wilful misconduct. It amounts only to simple negligence. To constitute "wilful misconduct" there must be actual knowledge, or that which in the law is esteemed to be the equivalent of actual knowledge, of the peril to be apprehended from the failure to act, coupled with a conscious failure to act to the end of averting injury. (*Smith* v. *Central etc. Ry. Co.,* 165 Ala. 407 [51 So. 792].) " '

"We believe that the court properly emphasizes knowledge or appreciation 'that danger is likely to result'. To us it seems clear that one who, while driving an automobile, knowingly flirts with danger and, without necessity or emergency compelling him, 'takes a chance' on killing or injuring him-

self and others, who may be so unfortunate as to be riding with him, is guilty of wilful misconduct."

The judgment is affirmed.

Thompson, J., Shenk, J., Edmonds, J., Langdon, J., Waste, C. J., and Seawell, J., concurred.