[Civ. No. 1857. Fourth Appellate District.—May 28, 1937.]

JACKIE COOGAN PRODUCTIONS, INC. (a Corporation), et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION OF THE STATE OF CALIFORNIA, NORA JONES et al., Respondents.

Charles J. Katz, Alfred Gitelson and J. L. Kearney for Petitioners.

Everett A. Corten and Arthur I. Townsend for Respondent.

BARNARD, P. J.—Petitioners seek to have annulled awards of the Industrial Accident Commission in favor of the wife, mother and son of one Charles Jones, who was killed in an automobile accident on May 4, 1935. The petitioning insurance company was the insurance carrier for Jackie Coogan Productions, Inc., a corporation, which will be herein referred to as the petitioner.

Charles Jones was employed by the petitioner on a ranch it owned in San Diego County near the Mexican border. On the day in question he accompanied John L. (Jackie) Coogan, John H. Coogan, his father, and two friends of the Coogans on a hunting trip to a point in Mexico about 25 miles from the ranch. The trip was made in an automobile

owned by Jackie Coogan, personally, and driven by John H. Coogan. While they were returning to the ranch an accident occurred which caused the death of four occupants of the car, including Jones. A proceeding before the respondent commission followed, with an award against the insurance carrier in the sum of $3,960.20 and an additional award against the petitioner based upon a finding that the injury was caused by serious and wilful misconduct on the part of the employer.

It is here contended that the evidence is insufficient to support the finding that the injuries suffered by Charles Jones arose out of and in the course of his employment, and the further finding that these injuries were caused by the serious and wilful misconduct of the employer.

With respect to the first point raised it appears that John H. Coogan was the president of the petitioner; that he and his wife owned all of the stock in that corporation with the exception of two qualifying shares; that the corporation had operated this ranch for a number of years and had never made a profit therefrom; that there was a guest house thereon which was referred to as a ''lodge''; that John H. Coogan frequently brought friends to the ranch and entertained them there, particularly over week-ends; that on this particular occasion friends of Jackie Coogan were being entertained over the week-end; and that Jones, as foreman, was employed by the month and was supposed to work or to be subject to call twenty-four hours a day and seven days a week.

The widow of Charles Jones testified that on previous occasions she had heard John H. Coogan order her husband to go on hunting trips with him and that her husband always went pursuant to these instructions; that one of her husband's main duties was to help entertain guests brought to the ranch and to assist in providing comforts for them; that he saddled horses for the guests, cleaned the game secured by them and assisted in cleaning and taking care of their guns before and after these hunting expeditions; that she had heard Jackie Coogan and his father discuss between themselves and with guests the fact that they would take her husband with them on hunting trips and that he would help clean the fowls and look after the guns; that when guests came to go on a trip or to spend a week-end on the ranch John H. Coogan would call her husband from whatever work

he was doing and have him assist in the matter of making the guests comfortable; that several times her husband had told her that John H. Coogan wanted him to go on hunting trips into Mexico; that John H. Coogan usually told her when he was going to take her husband with him and on May 3, 1935, he told her that he was going to take her husband with him the next day; that on this occasion her husband told her that he did not want to go on this trip, as he wanted to finish building a fence around some grain so that the cattle would not get in; and that just before her husband left on the morning of May 4th, he was working on this fence. The mother of Charles Jones testified that her son looked after the company that came to the ranch, took them milk and got firewood, and that John H. Coogan would just tell him they would go hunting on a certain day and that "they was always hunting a big part of the time".

Jackie Coogan testified, after saying that he had asked Jones to go on this trip about two weeks before May 4th, "Well, it was my father and I, we asked him. We were both standing there together and my dad told him he had lined up a dove hunt at Oscar Denton's ranch, and so I asked Charlie, naturally, to go with us, and I brought some shells for him from Los Angeles." He further testified that Jones had frequently gone on hunting trips with him and with his father; that he would not think of going out hunting without asking Jones if he was around where he could get hold of him, "because I liked his company and because he was a good shot"; that there were a lot of days when he could not get him as Jones was busy; and that "it is a different set-up. It wasn't like a strict employer and employee."

A Mr. Bernstein testified that he was general manager of the petitioner corporation; that John H. Coogan employed Jones in the first place; that John H. Coogan was the only one who would know what Jones' duties were; that the witness gave no orders to Jones except with reference to furnishing information for inventories and the like; that he did not know whether the trip in question was a pleasure trip or whether it was one in the course of Jones' employment; that during the shooting season they sent people down to the ranch; and that he knew that Jones had gone out on shooting expeditions "but I was never there at any time when they ever went off the ranch on a hunting trip". When asked if it was not Jones' duty to comply with any request

made by Mr. Coogan he replied that Jones was foreman and would naturally comply with suggestions made by Mr. Coogan, and that "I would do anything my boss asked me to."

It is petitioner's contention that the trip on which Jones met his death had no connection with his duties as ranch foreman, that on this occasion he stepped aside from his employment and engaged in a trip for his own pleasure, and that in so doing he was accepting an invitation and not obeying instructions. The evidence justifies the inference that this ranch was maintained, in part at least, for entertainment purposes and that a large part of the duties imposed upon Jones related to this use of the ranch. It may fairly be inferred from the evidence that Jones, as a part of his employment, was expected to go on hunting expeditions of this nature, that the situation was thoroughly understood by both sides, and that the duty thus resting upon him was no less real because the direction to go on this particular occasion may have taken the form of a suggestion rather than that of a direct order. In our opinion, the finding that the injury suffered by Jones arose out of and in the course of his employment is fully supported by the evidence. (*Shafter Estate Co.* v. *Industrial Acc. Com.*, 175 Cal. 522 [166 Pac. 24].)

█ With reference to the finding of serious and wilful misconduct on the part of the employer the evidence is as follows: The accident occurred at a point about two miles from the ranch, as the party was returning from this hunting trip. Jackie Coogan testified that for at least ten miles before the point where the accident occurred the road over which they traveled is a regular mountain highway; that the accident happened on the last of three curves; that as they approached this last curve in the series of three, a car coming in the opposite direction, forced them off the road; that they had gone around two of the curves and were negotiating the third curve when the crash came; that the third curve is a little sharper than the others and that as you start into the third curve you can see a distance of 100 feet ahead; that they were traveling on their right-hand side of the road; that just as they were coming to the crux of the third curve, at a speed of between 40 and 50 miles an hour, a car coming from the other direction shot around the point; that this other car was astraddle of the white line and was in the middle of the highway; and that the car driven by his father

turned to the right, hit a soft shoulder, started to skid, skidded quite a ways before it left the road, and then went off the embankment and crashed into the rocks below.

A Mr. Pollack testified that a few minutes before the accident he was riding along this road in another car and that some three or four miles before the point of the accident the Coogan car passed them going in the same direction; that at that time the Coogan car was traveling at from 70 to 75 miles an hour; that there were many turns and grades in the road; that the siren or horn on the Coogan car was sounded continuously; that ''it sounded like a police car or an ambulance''; that that car was being driven astraddle the center of the highway; and that he could see that car for 150 yards when it passed out of his sight around a turn in the road. Two other witnesses testified that the Coogan car passed where they were standing at a point about two and one-half miles from the scene of the accident; that their attention was first attracted to the car by the sound of its ''siren'' or ''whistle'', which was sounded continuously; that at that time the car was traveling at from 70 to 75 miles an hour; that a few minutes later they went to the scene of the accident; that there were seven white posts alongside of the highway at the end of the last curve before the scene of the accident; that two or three of these white posts were broken off; that the tracks of the Coogan car were visible on the shoulder of the road for a distance of 100 to 125 feet; that these tracks led to where the posts were broken off and down to the wreck; and that the marks showed that the tires had skidded for all of this distance of 100 or 125 feet.

An occupant of the car which passed the Coogan car on the turn immediately before that car left the highway testified that she first saw the Coogan car about 20 or 30 feet ahead of her coming toward the car in which she was riding; that the Coogan car was traveling at a speed of 75 or 80 miles an hour; that the car in which she was riding stopped within 10 or 20 yards after the Coogan car passed when another occupant of her car called out that the Coogan car had gone over; and that she then looked back and saw a cloud of dust. Another occupant of that car testified that that car was on the right-hand side of the road as it passed the Coogan car and that the Coogan car was traveling about 70 miles an hour. A third occupant of that car testified that that car was traveling on its right-hand side of the

road; that the Coogan car was traveling at about 70 miles an hour; that she looked back and saw the Coogan car leave the highway in a cloud of dust but did not see it light; that she spoke to the driver of the car in which she was riding; and that that car was then turned around.

The definition of the term "wilful misconduct" and the general rules applicable in the determination of the question of whether such misconduct appears in a particular instance are well established. (*Meek* v. *Fowler,* 3 Cal. (2d) 420 [45 Pac. (2d) 194].) In *E. Clemens Horst Co.* v. *Industrial Acc. Com.,* 184 Cal. 180 [193 Pac. 105, 16 A. L. R. 611], it was stated that serious misconduct on the part of an employer must be taken to mean "conduct which the employer either knew, or ought to have known, if he had turned his mind to the matter, to be conduct likely to jeopardize the safety of his employees". In applying these rules to a particular set of circumstances close questions are often presented. Generally speaking, we think it may be said that driving a motor car at an excessive speed is in itself not sufficient to establish wilful misconduct. (*McLeod* v. *Dutton,* 13 Cal. App. (2d) 545 [57 Pac. (2d) 189]; *McCann* v. *Hoffman,* (Cal. App.) [62 Pac. (2d) 401].) It has, however, been held that excessive speed, taken in connection with other circumstances, was sufficient to show that the driver of a car knew or should have known that injury to others would probably result from his actions. In *Walker* v. *Bacon,* 132 Cal. App. 625 [23 Pac. (2d) 520], driving an automobile at a speed of 66 miles an hour over a high crowned road that was not smooth, when the driver knew the condition of the road and knew that his automobile had a badly worn steering knuckle, was held to justify the conclusion that the driver was guilty of wilful misconduct. In *Norton* v. *Puter,* 138 Cal. App. 253 [32 Pac. (2d) 172], it was held that the defendant was guilty of wilful misconduct in driving his automobile at a speed of 55 miles an hour on a wet pavement with his vision obscured by falling rain, when his windshield wiper was not operating, when he knew that he was approaching a dangerous curve in the highway where he had had previous close calls, and when he had been warned to diminish the speed of his

car. In *Candini* v. *Hiatt,* 9 Cal. App. (2d) 679 [50 Pac. (2d) 843], a driver who had barely escaped an accident while driving around the first curve in a highway at the rate of 45 miles an hour, after being warned that he was driving too fast, and who, in disregard of a warning that he was approaching another dangerous curve, increased his speed to 50 miles an hour, with resulting injury to his passengers, was held to have been guilty of wilful misconduct. In *Medberry* v. *Olcovich,* 15 Cal. App. (2d) 263 [59 Pac. (2d) 551, 60 Pac. (2d) 281], the court said:

"The question of whether the minor defendant was or was not guilty of wilful misconduct is essentially one of fact for determination by the fact-finder. Appellants extensively review many cases involving wilful misconduct, calling our attention in their review that the facts in the instant case are similar to facts in some cases where judgment went for plaintiff, and that they are dissimilar to facts in other cases where defendant prevailed. It must be borne in mind, of course, that the interpretation to be given actions and conduct must turn on the circumstances of the individual case, and that decision passing upon facts constituting, or failing to constitute, wilful misconduct, can be of little assistance, other than to announce the definition of that term. It is our duty on appeal to indulge in all reasonable inferences to support the findings and judgment."

While the question before us is rather close we think it is primarily one of fact and that the evidence in its entirety, with the reasonable inferences therefrom, is sufficient to sustain the finding of the commission. The point where the accident occurred was within two miles of this ranch. It appears from the evidence that John H. Coogan had taken a number of trips which necessarily took him over this route and he must have been familiar with the fact that it was a mountain road with many turns. It appears, without conflict, that he was driving at an excessive rate of speed at two points a few miles away from the scene of the accident and there is ample evidence that just before the accident happened he rounded a turn in the road where vision was limited to 100 feet at an excessive rate of speed. The evidence justifies the inference that his speed while rounding that turn was inherently and extremely dangerous under the conditions there existing and that he knew or should have

known that injury to others was probable. Assuming that the evidence might have justified a different conclusion we think it may not be held, as a matter of law, that this fact-finding body exceeded its jurisdiction in viewing the evidence, with its reasonable inferences, as disclosing serious and wilful misconduct on the part of the driver of the car.

For the reasons given both awards are affirmed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 24, 1937, and an application by petitioners to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 26, 1937.