[Civ. No. 1861. Fourth Appellate District.—April 5, 1938.]

A. C. WRIGHT, Respondent, v. MILTON SELLERS, Appellant.

W. H. Stammer and Galen McKnight for Appellant.

Martin C. Thuesen for Respondent.

MARKS, J.—Plaintiff, a guest in defendant's automobile, brought this action for personal injuries which he suffered in an automobile accident on the Mother Lode highway about three miles north of Plymouth, California. He recovered judgment in the sum of $1250 and defendant has appealed from the judgment and from the order denying his motion for judgment notwithstanding the verdict.

The facts of the case are not in serious dispute, except as to a few details. In reviewing them we must, in accordance with familiar rules, accept those as true which tend to support the verdict and judgment and resolve all conflicts in the evidence in favor of the plaintiff, the successful party.

On February 26, 1936, plaintiff and defendant were friends of about two years standing. Both were peace officers. Defendant owned a practically new Buick automobile. His wife was in Placerville, California, distant from Fresno, California, about two hundred twenty-one miles. He invited plaintiff to accompany him on a trip to Placerville to bring Mrs. Sellers back to Fresno. The two men left Fresno at about 10 o'clock on the morning of February 26, 1936. It was necessary that they return to Fresno by 12 o'clock mid-

night of the same day as one of the officers had to go on duty at that hour.

The trip from Fresno to Ione was uneventful. After leaving Ione defendant increased his driving speed. Plaintiff remonstrated with him, without effect, for driving at this increased speed which plaintiff estimated at between sixty-five and seventy miles an hour.

Plaintiff described the occurrences just before the accident as follows:

"A. After we left Plymouth is when he commenced stepping on it. Q. What do you mean by that? A. Speeding. Q. And did you say anything then? A. I did. Q. What did you say? A. I told him to slow down, we would not get there, we would get there all mixed up, if we didn't. And he said, 'No, I know the road.' Q. And when was that with respect to the time when the car turned over? A. After that, in the same—during the same conversation he says, 'We must hurry on and get a bite to eat. My wife is a good driver and she will drive us back, and we will pile up in the back seat and go to sleep.' And at that time I turned my head and looked at him driving and I said, 'That part of it is sure fine, I wouldn't mind having a little sleep right now.' And everything turned black. I knew nothing more. Q. Now just before, immediately prior to the time that you told Mr. Sellers to slow down, immediately prior to the accident, had you determined at what speed the automobile was going? A. I hadn't noticed the speed so much. I knew we were traveling fast. I happened to look down at the speedometer and it was nearly seventy miles an hour. Q. And is that when you made the statement to Mr.— A. When I asked him to slow down, we would get there in pieces if he didn't."

Defendant described the road north of Plymouth and the events preceding the accident as follows:

"Q. When you left Plymouth, what is the nature of the Mother Lode road there? A. Well it is slightly down hill and not quite as good a road. Q. Is it down hill all the way to the place where the accident happened? A. I believe so. Q. And is it straight or does it have turns? A. It has turns. Q. It has turns. Were you familiar with that road? A. I was. Q. You had driven it before? A. I had. Q. Did Mr. Wright say anything to you about the—strike that. What

speed did you drive when you left Plymouth? A. Oh, around sixty miles an hour. Q. Mr. Wright make any statement to you concerning the speed you were driving at that time? A. Just prior to the accident he asked me to slow down. Q. At that time—about how long before the accident would you say, immediately prior? A. Well practically immediately prior, I would say, a few seconds. Q. And at that time isn't it a fact that you told him not to worry, that, 'I know this road'? A. I did. . . . Q. And will you tell us what happened just after Mr. Wright made that statement to you or asked you to slow down and you told him that you knew the road and not to worry about it. Tell us what happened immediately afterwards. Did you slow down? A. No, I did not. Q. Then what happened? A. Well as near as I can remember there was a slight turn in the road to the left and when we came upon this turn the two wheels on the right of the automobile got onto the shoulder of the road which was soft on account of the rain and it slipped around sideways and turned over. Q. Now was this road turning to the left or to the right at that place? A. To the left. Q. To the left? A. Yes. Q. And do you know what caused the automobile to get off onto the soft shoulder of the road? A. Well it was the turn, is all, I guess. Q. Did you attempt to keep the automobile on the paved portion of the road? A. I did. Q. Were you able to do so? A. I wasn't. . . . Q. Was there any mechanical defect with the automobile? A. No, there wasn't. Q. The automobile was in good mechanical condition? A. It was. Q. Will you explain to the jury just how the accident happened, please? A. Well after we left Plymouth I was going down a slight grade traveling about sixty miles an hour, between sixty and sixty-five, and came to this turn and I couldn't make the turn, and it got off on the soft shoulder there and slid around sideways and turned over. Q. You say you couldn't make the turn? A. No. Q. What do you mean by that? A. I was going too fast. . . . Q. What happened after the automobile you were driving got off the road then? A. Turned over. Q. Do you know how many times? A. I believe three. Three or four.''

It is established by the evidence that the roadway had a hard oiled surface about eighteen feet wide with a three foot

dirt shoulder on each side; that it had been raining; that the hard surface of the roadway was dry but that the shoulders were wet and soft.

The degree of the turn in the road at the place of the accident is not in the record. Defendant testified that he could see the road ahead for one or two hundred yards. As we must accept the evidence most favorable to plaintiff we must conclude that defendant's vision of the road ahead extended only one hundred yards. Some idea of the sharpness of the curve is evidenced by the fact that a roadway twenty-four feet wide disappeared from the view of defendant in one hundred yards. While such a curve might not be called sharp it was at least a distinct curve.

Plaintiff testified that immediately before the accident defendant was driving nearly seventy miles an hour. We must conclude that the rate of travel was slightly less than that figure.

From the foregoing facts the jury impliedly found that defendant was guilty of wilful misconduct. If, as a matter of law, that implied finding is not supported by material and competent substantial evidence the judgment must be reversed. If, on the other hand, that evidence justified the conclusion of wilful misconduct, it must be affirmed.

Starting with *Howard* v. *Howard*, 132 Cal. App. 124 [22 Pac. (2d) 279], the books are full of motor vehicle accident cases involving wilful misconduct. As each case must depend to a large extent on its own facts for correct decision, little benefit could be derived from our reviewing many of them. On the one hand are numerous cases in which the appellate and supreme courts found no difficulty in holding that the acts of a driver of an automobile constituted wilful misconduct. On the other hand are an equal, if not a greater number of cases where the acts relied upon were held, as a matter of law, not to constitute wilful misconduct. Between these two fairly well defined zones of decision appears another class composed of what may be called border line cases. It should be observed that the instant case belongs in the last class. In this class of cases, frequently, though not always, it has been held that the question of the existence of wilful misconduct is one of fact addressed to the trier of fact and not one of law for the appellate court.

Wilful misconduct has been defined by the Supreme Court in *Meek* v. *Fowler*, 3 Cal. (2d) 420 [45 Pac. (2d) 194], as follows:

"The phrase 'wilful misconduct', as employed in our so-called guest statute, has been variously defined in the many cases that have had occasion to consider the same. We shall not attempt to reconcile the several definitions and applications given to this phrase. It is satisfactorily defined in *Turner* v. *Standard Oil Co.*, 134 Cal. App. 622, 626 [25 Pac. (2d) 988], wherein it is declared that ' "wilful misconduct", within the meaning of this statute, may then be defined as intentionally doing something in the operation of a motor vehicle which should not be done or intentionally failing to do something which should be done under circumstances disclosing knowledge, express or to be implied, that an injury to a guest will be a probable result.'

"The case of *Howard* v. *Howard*, 132 Cal. App. 124, 128 [22 Pac. (2d) 279], after defining gross negligence as set forth in *Krause* v. *Rarity*, 210 Cal. 644 [293 Pac. 62, 77 A. L. R. 1327], and what is meant by wilful misconduct as set forth in *Helme* v. *Great Western Milling Co.*, 43 Cal. App. 416 [185 Pac. 510], declares that ' "The mere failure to perform a statutory duty is not, alone, wilful misconduct. It amounts to simple negligence. To constitute 'wilful misconduct' there must be actual knowledge, or that which in the law is esteemed to be the equivalent of actual knowledge, of the peril to be apprehended from the failure to act, coupled with a conscious failure to act to the end of averting injury. . . . ''

" ' 'Wilful misconduct implies at least the intentional doing of something either with a knowledge that serious injury is a *probable* (as distinguished from a possible) result, or the intentional doing of an act with a wanton and reckless disregard of its *possible* result.' '' (See, also, *Parsons* v. *Fuller*, 8 Cal. (2d) 463 [66 Pac. (2d) 430].)

The facts of the instant case cannot be distinguished in principle from those of *Jackie Coogan Productions, Inc.*, v. *Industrial Acc. Com.*, 21 Cal. App. (2d) 225 [68 Pac. (2d) 750], and *Fisher* v. *Zimmerman*, 23 Cal. App. (2d) 696 [73 Pac. (2d) 1243]. In both those cases this court held the findings of wilful misconduct were supported by the evidence. In both cases petitions for hearing in the Supreme Court were

denied. In both cases another motor vehicle was present at the scene of the accident, the speeds were somewhat higher, and in the Coogan case the curve slightly sharper than in the present case. There was no other vehicle near the scene of the accident in the instant case. We cannot regard those factual differences sufficient to distinguish the cases in principle.

In the Coogan case it was said: " 'The question of whether the minor defendant was or was not guilty of wilful misconduct is essentially one of fact for determination by the fact-finder. Appellants extensively review many cases involving wilful misconduct, calling our attention in their review that the facts in the instant case are similar to facts in some cases where judgment went for plaintiff, and that they are dissimilar to facts in other cases where defendant prevailed. It must be borne in mind, of course, that the interpretation to be given actions and conduct must turn on the circumstances of the individual case, and that decisions passing upon facts constituting, or failing to constitute, wilful misconduct, can be of little assistance, other than to announce the definition of that term. It is our duty on appeal to indulge in all reasonable inferences to support the findings and judgment.' (*Medberry* v. *Olcovich,* 15 Cal. App. (2d) 263 [59 Pac. (2d) 551, 60 Pac. (2d) 281].)

"While the question before us is rather close we think it is primarily one of fact and that the evidence in its entirety, with the reasonable inferences therefrom, is sufficient to sustain the finding of the commission. The point where the accident occurred was within two miles of this ranch. It appears from the evidence that John H. Coogan had taken a number of trips which necessarily took him over this route and he must have been familiar with the fact that it was a mountain road with many turns. It appears, without conflict, that he was driving at an excessive rate of speed at two points a few miles away from the scene of the accident and there is ample evidence that just before the accident happened he rounded a turn in the road where vision was limited to 100 feet at an excessive rate of speed. The evidence justifies the inference that his speed while rounding that turn was inherently and extremely dangerous under the conditions there existing and that he knew or should have known that injury to others was probable. Assuming that

the evidence might have justified a different conclusion we think it may not be held, as a matter of law, that this fact-finding body exceeded its jurisdiction in viewing the evidence, with its reasonable inferences, as disclosing serious and wilful misconduct on the part of the driver of the car.''

In the Fisher case it was said: ''Generally speaking, it is the rule in California that the question of the existence of wilful misconduct is usually one of fact addressed to the trier of fact and not one of law addressed to the appellate court. (*Del Bosque* v. *Singh*, 19 Cal. App. (2d) 487 [65 Pac. (2d) 951]; *Jackie Coogan Productions, Inc.*, v. *Industrial Acc. Com.*, 21 Cal. App. (2d) 225 [68 Pac. (2d) 750]; *Medberry* v. *Olcovich*, 15 Cal. App. (2d) 263 [59 Pac. (2d) 551, 60 Pac. (2d) 281].) In the instant case this question as one of fact was first addressed to the jury at the close of the trial, and next to the trial judge on the motion for new trial. If the evidence which we have quoted would support a finding of wilful misconduct on the part of defendant, the order granting the motion for new trial must be affirmed.

''It is generally held that mere speed, of itself, does not constitute wilful misconduct. This may not always be true. There may be a point at which the speed becomes so excessive, the danger of injury to the passenger so probable, that such extreme speed alone might be held to be wilful misconduct. Speed coupled with other circumstances has been held to constitute wilful misconduct. (*Petersen* v. *Petersen*, 20 Cal. App. (2d) 680 [67 Pac. (2d) 759].) . . .

''We believe that the evidence we have quoted would support a finding of wilful misconduct if one had been made in the trial court. . . . The condition of the oiled road with its dips and soft shoulders, coupled with the excessive speed at which defendant drove his automobile in the face of an approaching car, are circumstances which made injury to the passengers not an improbable result.''

When we apply the rules announced in the Meek, Coogan, and Fisher cases to the facts in this case we conclude that the implied finding of the jury that defendant was guilty of wilful misconduct has support in the evidence. He was familiar with the road. In the face of remonstrances on the part of plaintiff he drove his car at almost seventy miles an hour into a curve. He said himself that the speed was so

great that he could not hold his automobile on the paved portion of the road. He knew it had been raining and that the shoulders of the road were wet and soft. Any experienced driver knows the extreme likelihood of a bad skid when an automobile hits wet dirt at a high rate of speed. A skid at almost seventy miles an hour is always dangerous. These facts, namely, that defendant drove his automobile at a speed of almost seventy miles an hour into a curve, when the shoulders of the road on each side of an eighteen-foot pavement were wet and soft, justified the conclusion of the jury that he either knew or should have known that a serious accident and injury to his guest would be probable results.

Defendant relies upon the cases of *McLeod* v. *Dutton*, 13 Cal. App. (2d) 545 [57 Pac. (2d) 189], and *Hall* v. *Mazzei*, 14 Cal. App. (2d) 48 [57 Pac. (2d) 948], as establishing as a matter of law, that wilful misconduct was not proved in the instant case. The cases are distinguishable. (See *Parsons* v. *Fuller, supra.*)

In the McLeod case the defendant host driver passed another car on a highway at a speed of about seventy-three miles an hour. He returned to his own side of the road and found a third automobile across the highway in front of him. He saw this third car when it was too close for him to stop and a collision ensued. It is clear from the opinion that the court reached the conclusion that there was no wilful misconduct because defendant was unaware of the presence of the third car in time to stop. In the course of its opinion the court remarked:

"There is nothing in the evidence disclosing that when he attempted to pass the Packard car he knew, or had reason to know, that the Dodge car was a short distance ahead on his left-hand side of the road and in a position practically broadside to the course of travel.

"Whatever might be the force and effect, in an action based on simple negligence or gross negligence, of Barbara's caution about fast driving and to slow down, it is clear from what has been said that such evidence did not prove nor tend to prove knowledge of the presence of the Dodge car nor its position."

The effect of the holding in the McLeod case is that a speed of seventy-three miles an hour on a country highway is not of itself sufficient to constitute wilful misconduct.

The inference is clear that had Dutton known in time of the presence of the other car across the highway in front of him the decision on appeal might have been different. Thus the rule is there applied that to make him guilty of wilful misconduct he either must have known, or should have known, of impending danger which would make injury to his guest probable.

In the Hall case it appears that Mrs. Mazzei attempted to pass an automobile traveling ahead of her. In passing she speeded her car up to about sixty miles an hour. There were soft shoulders on either side of the pavement. The pavement was of sufficient width to have permitted her to pass in safety had she stayed on it. In some unexplained manner she drove off the pavement and the accident followed. The highway was straight and dry at the place of the accident. The court was of the opinion that her act of permitting her car to run off the pavement onto the soft shoulder, not her act of passing the other car at sixty miles an hour, was the proximate cause of the accident, and that under the evidence this was a careless act and not a wilful act. Independent of any of the reasoning and argument of this court in the Hall case, the ultimate decision there may be properly supported by the recent case of *Weber* v. *Pinyan*, 9 Cal. (2d) 226 [70 Pac. (2d) 183, 112 A. L. R. 407].

Defendant urges that plaintiff assented to the speed at which the automobile was driven and therefore voluntarily assumed the risks incident to such speed. He points to two remarks of plaintiff upon which he relies to establish this acquiescence. The first was made at a point about four miles south of Plymouth and six or seven miles from the place of the accident when plaintiff remonstrated at the speed. Defendant replied that he was a good driver and knew the road, to which plaintiff replied, ''Maybe so''. This should not be construed as a withdrawal of the protest as to speed. Further, we are not informed of the condition of the road at the point of this protest. We know that the condition of the road was worse north of Plymouth and the speed of the car there was greater. Even though the protest at the speed of the car south of Plymouth were withdrawn it would not be a consent to a higher speed under different conditions north of Plymouth.

Earlier in this opinion we quoted the conversation immediately prior to the accident. Defendant relies upon this conversation to establish plaintiff's consent to the manner in which the car was being driven. We cannot see any such consent from the remark made by plaintiff. Rather it was a consent to the plan for the return trip during which Mrs. Sellers would drive and the two men would sleep on the back seat.

■ Lastly, defendant contends that his own evidence absolves him from the charge of wilful misconduct. He testified that he and plaintiff were friends; that he thought he was driving safely; that he had no intention of causing an accident or of injuring his friend.

To establish wilful misconduct it is not necessary that an actual, executed intent to injure the guests be proved by parol evidence. Such a proved intent, if carried out, would constitute wilful misconduct. When the definition of wilful misconduct already quoted (*Meek* v. *Fowler, supra*) is separated into its component parts it appears that it is necessary that there be an intentional (conscious) act on the part of the driver; that this act may consist in doing something that should not be done, or in failing to do something that should be done; that this intentional act, or intentional failure to act, must be under circumstances disclosing a knowledge on the part of the driver that an injury to his guest would be a probable result, or under circumstances from which such knowledge on the part of the driver might be inferred. The consciousness must relate to the intentional act done, or to the intentional failure to act. The intent may be implied from the surrounding circumstances. An actual intent to injure is not a necessary element of which positive evidentiary proof must be produced. Such proof would rarely be possible. Few drivers would confess to the intent to injure a passenger. It is sufficient if the act, or the failure to act, be done or omitted under such circumstances as would justify the reasonable inference that the driver should have known that injury to his guest was a probable result, for again, positive evidentiary proof of such knowledge would be an impossibility in most cases. (*Jones* v. *Hathway*, 22 Cal. App. (2d) 316 [70 Pac. (2d) 681].)

The judgment and order appealed from are affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 2, 1938.