ROOSEVELT FIELD, Inc. v. TOWN OF
NORTH HEMPSTEAD et al.

Civ. A. No. 9707.

United States District Court
E. D. New York.

Jan. 11, 1950.

See also 84 F.Supp. 456.

James G. Moore, Garden City, N. Y.
(James G. Moore, Garden City, N. Y., and
Joseph H. Wackerman, Brooklyn, N. Y., of
counsel), for plaintiff.

Edwards, Froehlich & McDonough, Min-
eola, N. Y. (James D. C. Murray, New
York City, Francis B. Froelich, Mineola,
and Irving Greenberg, New York City, of
counsel), for defendants, Carle Place Wa-
ter Dist. and its Commissioners.

BYERS, District Judge.

This is an equitable action, commenced
February 9, 1949, in which the plaintiff
seeks an injunction against the mainten-
ance of a village water-supply tower, upon
the theory that it is an aeronautical hazard
and a public and private nuisance.

As to the alleged nuisance, no evidence
has been offered on behalf of the public,
and the plaintiff's right to assert that the
tower is such with respect to itself and
its lessees, rests upon such proof as it
has submitted concerning the alleged aero-
nautical hazard.

The case comes down to the question of
whether the plaintiff has proved by the
greater weight of evidence that it is suf-
fering irreparable damage because the de-
fendants have violated some law or laws
which it is the duty of this Court to enforce.

There is no conflict of evidence with
respect to the facts; thus the necessity dis-
appears for making findings in itemized
detail.

The following recital will suffice to
establish the basis for adjudication:

### The Parties

The plaintiff is a private corporation,
owning and operating an air field, of about

250 acres, in Nassau County, adjacent on the north to the well-known Mitchell Field. The air-port lies within two civil airways as designated by the Administrator of Civil Aeronautics; these are paths through the navigable air space of the United States, namely, Green (Los Angeles to Boston) and Blue (Philadelphia to Burlington, Vermont), and is officially designated as a class 2 facility.

The tenants of the plaintiff, named in the caption, rent hangar space from it, and operate planes in and out of the field in inter and intra state commerce, and otherwise function on the premises in connection with the private business of the plaintiff.

The defendants are the town named, the Carle Place Water District and the Commissioners thereof. Carle Place is an unincorporated Village of about 6,000 inhabitants, and the Water District is an instrumentality thereof, organized and functioning under the laws of the State of New York (Town Law, McKinney's Consol. Laws, c. 62, § 190 et seq.) under and subordinate to the town board.

The district—in size about 6,000 by 8,000 feet—was created in 1915 when the population of the village was about 1,000.

By reason of post-war conditions and developments, the latter figure rapidly increased to about 6,000 as of the times material to this cause, which means that residential expansion, in the matter of small homes, took place at a corresponding scale and pace.

During 1946, at which time water was being purchased from the Westbury Water District, the necessity arose for providing an adequate water supply in village and district in order to meet the needs of the residents for consumption, sanitation and fire protection.

It is not disputed that such necessity called for remedial measures, and the plaintiff's position is that a different form of construction, i. e., a lower tower, or one providing sub-surface tanks, should have been installed, and for failure by the defendants to employ such expedients, the injunction should be granted, upon legal theories later to be discussed.

## Procedure Followed by the Defendants

There was nothing clandestine or furtive about the erection of the tower, as will be seen from a summary of the steps taken to comply with applicable legal requirements:

a. The Commissioners petitioned the town board of the Town of Hempstead to approve the Map and general plan as filed for this improvement comprising: two new wells and pumping units, etc., upon land described; the erection of an elevated storage tank of 500,000 gallons capacity, and the installation of mains, all at an estimated cost of $300,000.00, to include the acquisition of the necessary plots of land.

b. Notice of a hearing thereon was published according to law on December 4, 1947, in the Westbury Times. The notice is quite detailed, in that it states the time and place of the meeting of the town board to "hear all persons interested therein concerning the same (the plan) and all evidence offered which will enable the Town Board to determine, pursuant to the provisions of the Town Law of New York, whether it is in the public interest to make the improvements described in said map and general plan and estimate, * * *".

· The said meeting was duly held at the Town Hall, Manhasset, on December 16, 1947, and there being no opposition, the plan was approved.

The town clerk was required by the provisions of Section 195 of the Town Law to file a certified copy of the determination or order of the town board in the office of the Clerk of Nassau County within 10 days after December 16, 1947, and another similar copy in the office of the state department of audit and control in Albany. In both instances the filing was not done, however, until November 10th and November 18th, 1948, respectively.

A review at the instance of any person aggrieved by any final determination or order (such as this order of the town board) could be had through certiorari proceedings applied for within 30 days from the date of filing in the County Clerk's office (Id. Par. 2 of Sec. 195). Thus an

aggrieved person could have initiated certiorari proceedings within 30 days from November 10, 1948.

The bearing of that observation is reserved for later comment.

c. Under the Conservation Law of New York, McKinney's Consol. Laws, c. 65, Section 523, the Water Power and Control Commission conducted a hearing upon the same application by the Commissioners, on February 6, 1948, in the new County Court House, Mineola, pursuant to notice duly published on January 29, 1948, in a designated newspaper (Westbury Times).

The notice states that it is for the purpose of affording a hearing to "all persons, waterworks, corporations, municipal corporations, * * *, that may be affected by the execution of the plans of Carle Place Water District for securing a new and additional supply of water, in Carle Place, Town of North Hempstead, * * *, plans for which have been filed with the Water Power and Control Commission at its office 90-79 Sutphin Blvd., Jamaica 2, New York, N. Y., where the same are open for public inspection; and for the purpose of determining whether said plans * * * are just and equitable to the other municipalities and civil divisions of the State of New York and to the inhabitants thereof affected thereby * * *". The notice calls for the filing of objections as a necessary basis for being heard in opposition to such plans.

While Roosevelt Field is not in the Town of North Hempstead, it abuts Carle Place, which is, and hence it is an inhabitant as a corporation of a civil division of the State, and is here claiming that it is affected by the plan referred to in the said notice. Such being the case, it could have filed objections to the plan.

It is not contended that the Water Power and Control Commission took any action or made any recommendation adverse to the said plan as presented by the Commissioners.

d. The Commissioners, after having duly advertised for bids, contracted for the water supply according to their said plan, discovered that the tower would violate the Building Zone Ordinances of the Town of North Hempstead by reason of its height, and thereupon applied to the Board of Appeals of the Town of Hempstead for a variance as contemplated by Art. XVII, Sections 1740 and 1748, of the Ordinances; this was granted after a hearing on October 6, 1948, of which due notice was published and posted.

In a suit in the Supreme Court of New York, attacking this action by the Board of Appeals, in which a taxpayer in the Town of North Hempstead was the ostensible plaintiff, a decision was published on December 12, 1949, since the conclusion of this trial, to the effect that the order granting the variance by the Board of Appeals was a nullity because the latter did not act as an appellate body, but directly, and at the instance of the Water Commissioners. Gordon v. Town of Hempstead, 93 N. Y.S.2d 250. That being the case, motions to dismiss the complaint were denied. So much must be deemed as having been decided by a court of competent jurisdiction, but it does not obscure the fact that the public officials who are defending this cause have acted throughout upon legal advice; they have sought to perform their public duties according to the requirements of the law, and with due proper and detailed notice to all who might be affected by their efforts to provide an adequate supply of water to a community greatly in need thereof.

That supply had been in successful operation for the year 1949, and the daily pumping at the time of the trial was 425,000 gallons. The entire cost, paid for by a bond issue, was approximately $298,000.00, to defray which consumption charges embrace amortization requirements.

The testimony for the plaintiff is uncontradicted, that its president had no actual knowledge of any of the proceedings which have been recited above on the part of the defendants; it is also true, however, that knowledge was acquired by him late in July of 1948, of the proposed erection of the water tower, which was well in advance of the hearing before the Board of Appeals concerning the variance.

### The Respective Properties

The diagram which follows has been traced from Exhibit 14 and depicts the runways of the plaintiff's air field, and the water tower as shown on the Exhibit. The dimensions of the runways are taken from the testimony. The gas tank shown below the air field is not involved in this litigation; its precise distance from the air field is not so shown, but its general location is, and it is about as far from the edge of the field as the Water Tower, but to the South. Many references to it in the record justify showing its approximate position.

Roosevelt Field has been operated as an air-port since about 1910 under various names, the present one having been adopted around 1919. As stated, it now contains about 250 acres, but was formerly nearly twice as large. In 1947 the eastern part of some 240 acres or so was sold to a race-track under an option granted in 1945. The two portions apparently were severed, however, in 1936, for in that year it was used as a motor raceway. The portion sold was some 20 feet higher than the part retained, so that if the original property were to be operated as one air field, the easterly 240 acres would have required levelling off to establish a common plane. That of course would have been a simple matter, as we know from what was done in other places during 1941 and subsequent years. This subject is alluded to for its possible bearing upon the plaintiff's election as of 1936, to foreclose itself from extending its runways to the eastward on its own property so as to avoid later developments such as those of which it now complains.

Roosevelt Field is not equipped with a tower to function in connection with instrument landings; such instructions are obtained by aviators from Mitchell Field.

The defendants' property on which the Water Tower was erected, was acquired in 1948, after the Town Board had approved of the plan submitted by the Water Commissioners, which was also later, in point of time, than the promulgation of certain standards and regulations of the Civil Aeronautic Authority which is herein to be called the C. A. A., and also of the various statutes cited by the plaintiff.

The C. A. A. has adopted air-port approach standards which reflect the views of the Authority as to the areas surrounding an air-port, which are deemed to comprehend the approach zones, i. e., the air space required for maneuver by planes leaving and approaching an air-port. This being a class 2 field, the angle of descent and ascent deemed proper, is 1 foot in 20 of lateral movement.

The standards are depicted in Exhibit 1 and, as applied to this field, embrace two miles of surface extending around the field.

This means that the entire Carle Place Water District lies within that area, and any water tower more than 150 feet above the ground level would be deemed by the C. A. A. to create an aeronautical hazard; thus it could not have been erected anywhere in Carle Place without being subject to the criticism implied by its failure to conform to the said standards (i. e., it could not have been moved further north as the plaintiff's president suggested).

### The Statutes and Standards Upon Which Plaintiff Relies

The basic statutes are known as "Air Commerce Act", Title 49 U.S.C.A. § 171 et seq., and "Civil Aeronautics Act", Title 49 U.S.C.A. § 401 et seq., respectively, which must be consulted for an understanding of the nature and extent of the supervision exercised by the Government in this field of activity. These enactments are expounded in United States v. Causby, 328 U.S. 256, 668 S.Ct. 1062, 90 L.Ed. 1206.

National sovereignty over the air space above the United States is declared, and the public right of freedom in transit therethrough is ordained, and navigable air space is defined as "air space above the minimum altitudes of flight prescribed by regulations issued under this chapter". Sec. 401(24).

The Administrator was directed to designate and establish airways, for instance, the Green and Blue airways referred to above; and he was "empowered (Sec. 457) and directed to make plans for such orderly development and location of landing areas, airways, and all other aids and facilities for air navigation, as will best meet the needs of, and serve the interest of safety in civil aeronautics".

The only regulation cited is 60.17, which is part of a manual of instructions entitled "Air Traffic Rules"; it has to do with minimum safe altitudes "except when necessary for take-off or landing" of 1000 feet over congested areas, and 500 feet over non-congested areas.

Then, too, Exhibit 13 is a booklet entitled "Airport Approach Standards"; included in it is drawing 672 (Exhibit 1)

which the witness Phillips stated definitely is not a regulation, which I suppose would be true as to the entire contents of the booklet.

Exhibit 13 is printed in part as Appendix B to plaintiff's brief. It need not be copied here, for it has to do with the requirements for marking (i. e., painting, and lighting) for the protection of air navigation, in the case of a structure more than 150 feet high. Notice is required to be given to the C. A. A. of the intention to erect such a structure. That notice was given in this case, and the requisite painting and lighting were provided, so that the provisions relied upon by plaintiff are not in question.

Thus the 150 foot floor of the turning and maneuvering zone is indicated in the standards promulgated by the C. A. A.

If there is a regulation establishing that minimum level in plain terms, I am unable to quote it for lack of citation.

There was no regulation, ruling or standard adopted by the C. A. A. which either in terms or by implication purported to *prohibit* the erection of this water tower.

The plaintiff also cites and seemingly relies upon Section 249 of the General Business Law of New York, McKinney's Consol. Laws, c. 20, touching the classification of air ports as in accord with the standards established by the C. A. A., and Section 240 which is similar in import as to Civil Airways, and Control Zone.

Also Section 356 of the General Municipal Law, McKinney's Consol. Laws, c. 24, as to restrictive regulations concerning the heights of buildings and structures which are to conform to such standards as may be promulgated by the C. A. A. Section 355 of the same statute provides for condemnation or acquisition by any city or village of the right to unobstructed use of air space within 3000 feet of an air port.

No question of condemnation arises in this case.

The foregoing comprehend the legal bases of the plaintiff's asserted right to obtain an injunction against the continued operation of this water tower.

The plaintiff's theory is thus stated in its brief: "No 'taking' of defendants' property in the super-adjacent air is involved in this action, for the reason that their use of the upper reaches thereof had already been taken by the exercise of such police powers; rather, there has been a 'taking' by the defendants of property in the public domain through which the plaintiffs have 'freedom of transit'."

With this understanding of the nature of the controversy, it is proposed now to discuss the evidence.

It is clear that the C. A. A. regards this water tower as an aeronautical hazard. So much appears from the testimony of the witness Phillips, Chief of Air Navigation Facilities, Planning and Control Staff of the C. A. A. functioning in the affected area.

He was the first to learn of the plan of the Water Commissioners, through the receipt of a letter from the Engineer in charge, dated July 20, 1948, enclosing form A.C.A. 117. That was in compliance with Administrator's Regulations, Part 525, referred to above as Appendix B to plaintiff's brief. The letter and form attached constitute Exhibit 9.

It is necessary to be clear about this, for it is the subject of apparent misunderstanding in the plaintiff's brief, caused perhaps by the use of the word "application" in the covering letter. In one sense it was an application for instructions as to marking, as appears from the last three lines of the form.

It was not an application, however, for permission to build the tower, and the plaintiff's treatment of it as such in the brief is mistaken. This is so because there were no regulations empowering the C. A. A. to receive or to act upon such an application.

Moreover, the C. A. A. so understood the situation, for in later correspondence (Exhibit 12, November 4, 1948) the following appears:

\* \* \* \* \* \*

"As you may already know, this Administration does not have the authority to prevent this construction. We feel

bound, however, in the interest of the safeguarding of lives and property, to once again solicit the aid of the Commissioners in the District in reconsidering and complying with the recommendations previously offered to you.

"Failing in this, and in order to minimize this hazard to air navigation, it is recommended that the structure be obstruction painted in accordance with * * *."

The foregoing correctly portrays the legal aspect of the situation, and was written, as the witness said, after careful consultation with the legal department of the Authority.

It is to be understood, therefore, that the defendants did not apply for a consent to the erection of the tower, nor did they invite anything more than instructions for painting and lighting.

Having seen that the structure was deemed to be an aeronautical hazard by the C. A. A., it is appropriate to consider whether the evidence shows that it is indeed a hazard in the practical sense.

As to the purpose of Exhibit 1—the Standard issued by the C. A. A.—the witness Phillips says: "This Exhibit is also used (distinguishing from projected airfields or alterations in existing ones) to indicate to anyone who owns or operates an air port that their approaches should be cleared in accordance with the Standard if they desire normal, safe operation of that airfield."

This means that the testimony must be tested for what it shows for the year 1949 as to normal and safe operation of planes in and out of Roosevelt Field. In that connection, it is to be remembered that the C. A. A. has promulgated, as part of its standards, a turning and maneuvering zone 150 feet above the level of a given air port, which extends laterally two miles from its usable area. Ordinarily that zone can be thought of as extending vertically from the 150 foot level, for about 600 to 800 feet, according to the traffic pattern (i. e., the traffic rules of the road, so to speak, for air craft while within the turning and maneuvering zone), as those are the alti-tudes "most commonly used for traffic patterns".

The witnesses Baldwin, Brown, M. T. Holbrook, and W. F. Holbrook were pilots called by the plaintiff, and testified that in their opinions the water tower should be considered as a hazard to air navigation. The first, second and fourth fly planes for tenants of the plaintiff, while the third is a private pilot.

The defendants' witnesses Webber and Fredenburgh, also pilots, who flew in the U. S. Army, have no relation to any of the parties to this suit.

All these witnesses were well qualified (three had held commissions in the U. S. Army Air Service), and have flown in and out of Roosevelt Field for many years. Webber and Fredenburgh do not consider the tower a hazard, although Webber said perhaps it might be thought to be a remote hazard.

Baldwin was the principal witness for the plaintiff in this connection, and used a blackboard for demonstration purposes. His explanation of the incidents of navigating a plane on take-off and in landing, including necessary turns (which involve banking) in circling around for either purpose, and the customary altitudes involved, was quite instructive, and his testimony may be consulted with profit. His opinion, that the water tower may be considered a hazard, was restricted to an emergency arising from loss of power in either engine, on take-off, and the risks imposed by traffic in general in the turning zone. He said on cross-examination, that with a normal take-off from runway 5-23 (into the northeast) there would be no interference caused by the tower.

Brown agreed in general, but said that weather conditions should also be considered as they tend to decrease visibility, and that pilots unfamiliar with this field might be hampered thereby.

M. W. Holbrook thinks that the water tower is a hazard since, as to 38 feet of height, it projects into the turning and maneuvering zone, at the minimum height if C. A. A. recommendations are followed,

of 150 feet. He stated that this turning zone is a part of the air port, as the door is part of a garage.

That comment somewhat unwittingly exposes the essential legal difficulty in this case. From the standpoint of the aviator, the turning zone is considered to be part of the air port. But the law has not so decreed. It is a space in the air, not lying above an air port, but adjacent to that which does, in which supervision for the purpose of ordered navigation is vested by law in the C. A. A., but that supervision is by no means synonymous with appropriation; it has for its objective an intelligent integration of navigation on the part of air craft, in their relations one to another. (See the regulations.)

He stated that, in a take-off toward the South from the principal runway 5-23, there would of course be no hazard created by the tower. In one toward the Northeast under ordinary conditions, he would not turn left until he had proceeded straight for a mile and a half, and then he would be a mile from the tower. In making a landing from the Northeast, he would pass the tower at an altitude of 150 feet, 500 feet off.

In coming in to runway 14-32 from the Northwest, he would come over the tower "If you were cutting it real short".

W. F. Holbrook's statement is: "It could be a hazard under we might say bad conditions, due to bad weather, or it could be a hazard to a stranger who happened to fly into the field and wasn't on the alert and did not notice it."

That statement seems to be as far as he cares to go.

All of the pilots have been using this field regularly in 1949 without incident— nor has any been reported.

The testimony of the defendants' witnesses Webber and Fredenburgh must be deemed to have offset much that the plaintiff's witnesses offer as the bases of their opinions. For instance, the former quite convincingly showed that the normal take-off is sufficiently in a straight line to enable a pilot to pass this tower from runway 5-23 in a northeasterly direction to a point 2000 feet from it, before making a left turn; and in using runway 14-32, the tower is at least a half mile away at the time of turn. That in the event of engine failure near take-off, the first effort of the pilot is to trim his plane and settle on a straight course; having attained the latter, he so proceeds until he can effect a safe landing after achieving such altitude as the circumstances require, 500 feet being safe practice.

As to strange pilots, he said it was customary for them to consult the Airman's Guide, published by the U. S. Department of Commerce.

In the October, 1949, issue thereof, the only hazards listed relating to Roosevelt Field are the telephone lines on Old Country Road immediately to the north as shown on the diagram above.

Fredenburgh had qualified to testify as to what would happen in the event of an engine failure arranged for, but unknown to the pilot as to exactly when during the take-off it would occur. His handling of the situation vindicated Webber's theories and quite definitely proved those of Baldwin to have been mistaken. Fredenburgh was persuasive as to why the tower is not a hazard.

Most of this testimony had to do with runways 5-23 and 14-32 because they are the longest and are the ones adapted to practical use. Incidentally that is also the effect of the testimony of plaintiff's president, later to be referred to.

Runway 4-22 (1600 feet) was said by him to be useless for DC-3s and that it was not included in the flight pattern of this field issued October 6, 1948.

Baldwin has never used this runway and would not under no-wind conditions; he thought it could be used against a head wind of 35 to 45 M.P.H. Brown has used it twice in four years, under high wind conditions.

For the purposes of this decision, that runway is not deemed to be affected by the presence of this tower. The same remark applies to a nondescript grass strip running north and south, called 18-36, not shown in any testimony to have been in use as a runway; this alleged strip was the subject

of an amendment to the complaint granted without objection at the end of the plaintiff's case. It seems to have been imported to show that in general the water tower lies north of it, and in the line of take-off or landing, as distinguished from 5-23 and 14-32. But no take-offs or landings from or to that strip were testified to, before or after the tower was erected.

The pilots' testimony has been discussed at some length, because it is thought to illuminate the most important aspect of the case. It comes down to this: The tower is the kind of structure, because of its height, that is properly required by the C. A. A. to be distinctively painted for recognition in the daytime, and to be distinctively illuminated at night, so as to be recognized as a potential source of danger to a plane which is navigated within the turning and maneuvering zone frequented by air craft moving in and out of Roosevelt Field. The instructions which were sought in that behalf, by the Engineer in charge, should have been requested, and conformity thereto was requisite if the duties of the C. A. A. were to be the subject of cooperation within the area subject to flight supervision, by other public officials.

This means that within the standards of that agency of government this tower should be characterized as an aeronautical hazard, for not otherwise could the distinctive painting and lighting have been legally authorized.

It means also, if the testimony of the pilots is understood, that, in the practical sense, some of them regard the tower as a hazard, and others do not. All of them think that the gas tank of the Long Island Lighting Company, which is higher by about 70 feet and of greater diameter, is a practical hazard, as are the poles and wires (some of them high-tension) which are close to the field, and are best shown in part on Exhibit 18.

It is not the view of this Court that the presence of other hazards would vindicate the introduction of a new one; but it is also thought that the existence for many years of the former measurably enhances the task of the plaintiff in seeking to prove that irreparable damage is to be predicated

of the maintenance of this lately erected water tower.

In considering this subject, it is necessary to remember that customarily a plane takes off, and lands against the wind, which means that only half of the two operations are conducted on the same heading; in other words, even a potential or possible hazard can be present during only about one-half of the take-off and landing operations.

## The Equities

■ As to the plaintiff, it should be stated that the president is on record, in a proceeding in the New York Supreme Court touching the valuation of his company's stock in December of 1947, that there were two runways on the field (5-23 and 14-32, thus excluding 4-22). That the runways were not long enough to permit passenger air craft, commercial passenger, big air craft, to come in and out of the field loaded.

The runways are still of the same length as in December of 1947.

He said that a DC-3 plane would be the largest that could come in loaded, and that such planes are regarded as obsolete in airline operation. That 4-motor planes are in current use for passenger service, but that the field is too small to accommodate them loaded.

Finally: "Q. And can't you tell us what you think the best use of Roosevelt Field is as of December 1, 1947? A. I can say that the best use is not for an air port."

This evidence was admitted over objection, as an admission by the witness which was relevant to the allegations in the complaint verified by him touching irreparable damage as alleged, and lack of adequate remedy at law.

The plaintiff's witness Baldwin and other pilots also testified that DC-4, the planes now used in passenger traffic, are too large to use this air port because of its short runways. The plaintiff's witness Moulton, Supervising Agent of the C.A.A., said on this subject: "Geographically it (Roosevelt Field) is not suited for competition with

air-line activity. It is well suited for privately owned air craft."

That condition is obviously unrelated to the 38-foot penetration of the water tower into the turning and maneuvering zone which has been described.

The plaintiff has not undertaken to prove any loss in its business flowing from or attributable to the erection and maintenance of the water tower. It is true that the figures stated by the witness Guthrie as to arrivals and departures of planes in both kinds of commerce indicate a decline in business in 1948 as compared with 1947, and in 1949 (ten months) as compared with 1948, but neither he nor any one else sought to attribute any such result to the subject-matter of this controversy. The 1948 decline, which of course antedated the presence of this water tower, is consistent with the testimony of Guthrie which has been quoted above, concerning the debilitation which had overtaken Roosevelt Field in December of 1947. That is a progressive condition, in view of the residential development of the area in which the field is located.

The neglect of the plaintiff to seek to review the decision of the Town Board, in approving the plans of the Water Commissioners, has its place in this aspect of the litigation.

The failure to file the order of the Town Board until November 10, 1948, operated in favor of the plaintiff, for within 30 days thereafter it could have undertaken the certiorari proceedings heretofore referred to; by then, the plaintiff had acquired actual knowledge of all that was contemplated in connection with the enterprise initiated by the Commissioners of the Water District. That would have been a convenient method by which to test the project in its legal aspect, as well as from the engineering point of view. If the statutes of New York, presently to be referred to, had any bearing on the subject, the opportunity was available so to demonstrate, in the form and manner adopted in the case involving the variance in the zoning regulations.

The election to employ the type of litigation now before this Court cannot be ignored in reaching a conclusion as to whether the alleged irreparable damage is in fact present, and whether there was indeed a lack of remedy at law as of December 9, 1948, two months before this bill was filed.

Plaintiff's citations on this point have been examined and found not to be helpful: Ng Fung Ho v. White, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938, decides that, in a deportation case under the Chinese Exclusion Act, 22 Stat. 58, as amended, the relators were entitled to a judicial hearing of the issue of asserted citizenship.

The New York cases of Staten Island Edison Corp. v. Maltbie, 296 N.Y. 374, 73 N.E.2d 705; Baddour v. City of Long Beach, 279 N.Y. 167, 18 N.E.2d 18, 124 A.L.R. 1003; Arverne Bay Construction Co. v. Thatcher, 278 N.Y. 222, 15 N.E.2d 587, 117 A.L.R. 110, and Brous v. Town of Hempstead, 272 App.Div. 31, 69 N.Y.S.2d 258, at most distinguish between the issues in specific certiorari proceedings, and constitutional questions where there is an assertion of the taking of property without due process of law. Nothing is written in any of them to forbid this Court to take into consideration the plaintiff's failure to resort to a legal remedy, i. e., certiorari, that was open to it, in deciding whether the most extreme form of equitable remedy is the only redress which it could have sought, bearing in mind that no property of the plaintiff has been taken by these defendants.

As to the defendants, the bare statement of their proceedings, and the nature and purpose of the structure complained of, suffice to show that the public interest is at stake, and that alone constitutes the merits of their cause.

I know of no justification for the use of the expressions in plaintiff's brief, that the defendants proceeded with the erection of the water tower at their peril; or that their conduct has manifested "callous indifference".

Their first duty was to obtain an adequate water supply for the residents of Carle

Place. Having secured sanction for their plan according to the requirements of law, they were in the course of carrying that plan into effect when the plaintiff interceded in its own private interests. But that gesture was not accompanied by any offer to assume even part of the cost of changes, if such indeed could have been made as late as the months of August and September of 1948. As to that, nothing was offered to contradict the negative testimony of the Engineer in charge.

If indifference was present, it was at least mutual.

Since the plaintiff has failed to prove that it has suffered any damage caused by the presence of this water tower, irreparable or otherwise, and since the proposition that to deprive the residents of the supply of water from the plant of which this tower is an essential element would be to court public disaster is self-evident, it results that the equities of the case lie with the defendants.

Sight has not been lost of the plaintiff's theory of the law of the case, as quoted above. It is thought to be erroneous, in that the defendants' use of 38 feet in the air space having for its lower level an imaginary plane 150 feet above the level of the plaintiff's air port does not involve anything which "has been taken by the exercise of the police power" because there has been no taking, since neither statute nor regulation purports so to operate. Title 49 U.S.C.A. § 452(c) indicates that, when Congress intended to provide for the condemnation of "easements through or other interests in airspace", it knew how to legislate in express terms.

 Manifestly the plaintiff has no property in the air space lying above the lots containing the tower and other elements of the water supply system in question, nor has it demonstrated by the greater weight of evidence that it, namely, its tenants for whom it purports to act, have suffered an impairment of their "freedom of transit" in or through the turning and maneuvering zone which is resorted to by air craft operating in or out of Roosevelt Field.

Sight has not been lost of the plaintiff's reliance upon the New York statutes, General Business and General Municipal Laws, heretofore referred to. They do not purport to add to the authority vested in the C. A. A., and it is upon the regulations and standards promulgated by the latter that the plaintiff bases its cause. The cited statutes are consonant with, not in extension of, the powers created by applicable national legislation. The General Municipal Law sections have to do with the acquisition of public air ports by municipalities.

 The parallel which plaintiff draws between the sovereignty of the Federal Government in the air space above the United States, and that over navigable waters, is true and complete. In the exercise thereof, Congress has prohibited the erection of certain structures in navigable waters, Title 33 U.S.C.A. § 401, while it has not done so in the air space. It is that difference in the exercise of governmental function which must govern this decision.

Upon the entire case, it is concluded that the plaintiff has failed to sustain its burden of proof, and that judgment upon the merits must be awarded to the defendants, with costs.

Settle decree, and conclusions of law if desired.