[Civ. No. 26494. First Dist., Div. Two. Apr. 23, 1971.]

LINDA D. MITTELMAN, a Minor, etc., et al., Plaintiffs and Appellants, v. LEE D. SEIFERT, as Administratrix, etc., Defendant and Respondent.

**COUNSEL**

Demanes & Sanders, Floyd A. Demanes and A. Lee Sanders for Plaintiffs and Appellants.

Edward I. Pollock, Robert E. Cartwright, Theodore A. Horn, Marvin E. Lewis, William H. Lally, Ned Good and Leonard Sacks as Amici Curiae on behalf of Plaintiffs and Appellants.

Costello, Johnson & Kemp, Costello & Johnson and Cyril Viadro for Defendant and Respondent.

**OPINION**

**DAVID, J.**[*]—

I

Minor plaintiffs (Linda D., Paul B., and Kirk E. Mittelman) by their guardian ad litem (Florence C. Hind) appeal from a judgment in a wrongful death action, on a 9-3 verdict, denying recovery based on the death of their parents, Joseph and Edna Mittelman. They were killed, along with the pilot, Charles J. Seifert, Jr., about 2:50 a.m. March 19, 1966, when 10 days after he acquired it Seifert's twin engine Apache airplane crashed one-quarter to one-half mile northeasterly of the end of the runway of the Half Moon Bay Airport; from whence they were returning on the 20-25 mile flight to Palo Alto Airport. The evidence established that Seifert was the pilot at the moment of impact.

The crash was at high speed,[1] on a 10 percent slope near the adjacent hilltop resulting in complete disintegration of the plane and its riders. Human body parts were strewn over the path of collision from one-and-a-half to two blocks.

It was stipulated that at the time of the impact, the Apache aircraft

---

[*]Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

[1]Normal operating range of this aircraft was shown to be 66 to 165 miles per hour, the "Red Line" maximum in smooth air being 208 miles per hour. Stalling speed with landing gear and flaps up was 66 miles per hour.

was traveling with the right wing in a near vertical downward position and the nose of the plane down. The magnetic heading of its course, as shown by the distribution of the wreckage was in an east, northeasterly direction. There was no evidence of preimpact failure or malfunction of the aircraft's two engines, spark plugs or magnetos, nor any physical evidence of lack of structural integrity of the plane prior to the accident. Adequate fuel was present. Recovered from the crash site, the aircraft clock read "2:50."

The Half Moon Bay Airport is located on the coast of the Pacific Ocean 64 feet above sea level. It is separated from the Palo Alto Airport by a ridge of the Coast Range Mountains. These vary in elevation from about 1,900 feet at the highest, to a minimum 1,000 feet at the lowest pass, the San Mateo Canyon Road. Safe flight in daytime requires these elevations be cleared by 1,000 feet; and at night one expert testified 2,000-foot clearance was necessary for safety. Though one might cross to the south, at the Saratoga Gap, or follow a hairpin course, north through the Golden Gate and then south to Palo Alto, the most practical route between these two airports necessitates crossing this coastal range.

Mr. Silvestri,[2] aviation expert and manager of the Half Moon Bay Airport, testified that even through the San Mateo Canyon pass, the minimum safe crossing altitude would be 2,500 feet. For safety at night, expert Cutter[3] who was familiar with these airports testified pilots should clear the top of the Coast Range by 2,000 feet.

The first hill adjacent to the airport on the east slopes upward to an altitude of 400 feet. The crash site as shown by Exhibit 28, was at a considerably less elevation.

Planes departing from the airport are required to follow the Federal Aviation Agency (hereafter FAA) flight pattern. At night, a plane takes off to the north and at an elevation of 800 feet is to make a right turn easterly toward the hills, as indicated by the lighted tetrahedron. The 800-

---

[2]Plaintiffs' witness Frank F. Silvestri was a flight school operator and manager of the Half Moon Bay Airport since 1958, with some 11,000 hours of flying time since beginning his flying in 1939. He had a staff of four instructors and an average of 90 to 100 students. He was an official, licensed weather observer.

[3]Plaintiffs' witness, Albert Wilson Cutter, M.D., was an expert aviator and an expert in aerospace medicine; from 1961-1965 he did research in aerospace medicine with Space General, a subsidiary of Aerojet. He was trained as a Navy pilot, and flew for several lines as an airline pilot, with approximately 7,000 hours of flying time, and held an air transport rating, which requires a minimum of 1,200 hours flight time, including instrument rating. He previously held both a commercial and instrument rating; and held a single-engine land and sea and multi-engine rating, also a commercial glider rating. He is a senior aviation medical examiner, authorized by the FAA to examine pilots for medical clearance of all classes; including second class, held by Seifert. He operated his own aircraft and had flown from Palo Alto Airport into the Half Moon Bay Airport. He had flown a Piper Apache between 400-500 hours.

foot altitude is measured from sea level rather than from the base elevation of the airport, because of the frequent low overcast.

The Half Moon Bay Airport is not well lighted at night. Only the lighted outline of the single runway can be seen, not the surface.

Dr. Cutter, himself an expert flyer, testified that the few lights at Half Moon Bay Airport are confusing for night flight. The pilot may line them up as horizon when in fact they are on the ground.

On March 19, John Preuss, United Air Lines employee and former flight engineer, left the San Francisco Airport at 12:30 a.m. and after stopping to eat, returned to his home at Moss Beach, about three-quarters of a mile north of the crash site. Outside his home, while attending to his dog, he heard a twin engine plane and saw its lights, recalling its red light rising above the blue.[4] The lights disappeared into the cloud bank or fog. He couldn't give the flight level, everything was on the ground. The aircraft appeared to come from the direction of the airport, was above the trees, perhaps 150 feet above ground, was gaining altitude, slow gain. At that time it was pitch black, the weather bad, no visibility of any kind; there was rain, heavy fog and clouds.

On his way home he had passed through fog and rain so hard that his single speed windshield wipers could not clear the water away.

At the time he saw the plane there was ground fog from Montara north; he could see the dull mass of trees 150 yards away. The plane did not appear in difficulty, though he noted an engine was running rough, spluttering, like out of gas.[5] His observation was for about 10 seconds, and he paid no attention after the plane was out of sight and did not hear any crash. He stated the occasion was very unusual; because planes don't fly out of Half Moon Bay Airport at night. He thought, "today is a hell of a night to be up there on a plane or either running out of gas and or anything else."

According to his deposition taken two years after the crash, on May 18, 1968, defense witness Donald Hadding was on duty as a night watchman at the candle factory to the west of the landing strip of the Half Moon Bay Airport. He stated that on March 19, 1966, he saw an aircraft headed north land or take off about 1 a.m. not very high. The plane about 1:05 a.m. came in south to north, touched down, bounced-like and took off; about 1:35 a.m. made another touchdown; back again, it touched down about 2:05 a.m.; it was going too fast to land. On the third pass, it turned

[4]Red on left wing, blue or green on right wing.
[5]14 Code of Federal Regulations section 91.23 prescribes fuel requirements.

to the right instead of the left and gradually turned east toward the hills. He was sure this was a one-engine plane and that it was the plane that crashed.

Hadding stated that between 1 and 2 a.m., the weather was clear and he could see stars. About an hour earlier, at midnight, there had been fog. It was raining before 10 p.m., fog, 10:30 p.m. to 12 midnight.

The expert testimony of Captain Paul T. Adams[6] was that during the climbing portion of the flight from the airport at night in the type of aircraft here involved, the structure of the cockpit and the nose of the aircraft would tend to obscure the runway lights on the ground and any lights in front of the aircraft. When the aircraft is in a nose-up position, this obscured visibility is increased. The wing on the left-hand side of the aircraft interferes with the pilot's ability to see the ground on his left side, particularly while the aircraft is in a right turn where the left wing is up and the right wing is down.

Loss of horizon in flying blind, whether because of darkness or flight into clouds, produces spatial disorientation and vertigo in a pilot rapidly, and usually leads to disaster.

Since an aircraft operates in a three-axial plane and travels at a great speed, spatial disorientation and vertigo can be serious impairments to safe aircraft operation. Spatial disorientation occurs when a person has lost his reference to the horizon, "flying blind." Vertigo is the sense of dizziness that can develop from spatial disorientation and is very likely to occur in a person suffering from fatigue.

Expert Captain Adams described what could occur from loss of horizon. At night without stars or ground lights a pilot could not get by without instrument flight. A pilot penetrating a cloud could not remain level without instruments. If he lost the horizon, he would go into a steep turn, drop the

---

[6]Plaintiffs' witness, Captain Paul T. Adams, was flight instructor for Nystrom Aviation, with 40 years' flying experience beginning as a Navy pilot in 1924, and after a naval aviation career was a Pan American Airways international pilot from 1933 to 1960, accumulating about 30,000 flying hours; which at the time of trial was 34,500 hours. He held the ratings of airline transport pilot with single and multi-engine land and sea rating, plus rating for certain airplane types; and a flight instructor's rating, instrument airplane land and sea. He acted as flight instructor during his entire service with Pan American World Airways. He attended and taught ground schools. He acted as a check pilot, a designation given by the FAA, for 20 years with Pan American; later he was FAA examiner, until 1967 when he went on part-time employment. He was an instructor in several flying schools, including Nystrom at Palo Alto, where he was chief pilot. As such, he gave Seifert two periods of instruction in the Apache airplane, 138 minutes and 90 minutes respectively, the first of which was on March 9, 10 days before the fatal crash.

nose of the plane, speed increasing. Trying to correct this, probably he would try to pull back on the yoke to raise the nose, pull up too much, and stall. This would initiate the "graveyard spiral," the "dead man's spiral."

Defense expert Roger D. Goetz[7] said vertigo was common under conditions of blind flying and testified that if one runs into a cloud flying visually, not flying by instrument reference, he tends to have vertigo in from 30 seconds to 5 to 7 minutes. It can be of such duration and intensity as to cause the pilot to lose control of the aircraft.

The purpose of instrument flight discipline is to train a pilot to rely on instruments despite false senses as to his position in space and the dizziness or vertigo. This takes considerable time and continual practice. To stay proficient, recurrent training of at least six hours every six months is required. Carrying passengers under instrument flight conditions without having the rating clearly violates the regulations prohibiting such flights. Seifert had not qualified for instrument flight.

Dr. Albert W. Cutter, an expert aviator, testified that spatial disorientation from loss of horizon, and vertigo, result from blind flying, and that it takes a great deal of time and practice to evaluate and coordinate instrument readings. A pilot with no recent experience probably would lose 100 percent control within one minute.

Even without complications imposed by clouds and bad weather it is evident that one may be flying blind at night. "[A] night flight is practically an instrument flight, whether you penetrate clouds or not, and this would be a very variable factor as to how much visibility there was, but if there was just three miles visibility this would be very limited and I think it would probably be about—well, I would say 90 percent chance of loss of control occurring. . . . Without penetrating clouds, . . ." said Dr. Cutter.

The opinions of all the expert witnesses, based upon the hypothesis of a pilot of the physical condition, training and experience of Seifert, at night, and under the varied testimony as to the weather conditions aloft, were that it would not be prudent, even reckless and foolhardy for a pilot

---

[7]Defense witness Roger D. Goetz at the time of trial was a pilot for Pan American. In 1966, he was a salesman for Nystrom Aviation in Palo Alto, and sold Seifert both the Apache twin engine plane and the predecessor Cherokee single engine plane. Goetz, who started flying in 1947 or 1948, held a commercial pilot's license with aircraft rating for single, multi-engine land, instrument, flight navigator and air frame and power mechanic licenses; and held an instructor's rating. He had 4,000 hours of flight time. He had one flight with Seifert in the Cherokee, and when Seifert traded it in on the Apache, a month later, he flew with him in it for 25-35 minutes.

like Seifert not rated for instrument flight to attempt to fly over the coastal hills from Half Moon Bay to Palo Alto. Thus, Silvestri testified that a prudent pilot would not attempt such flight under conditions he observed at 10:30 p.m. and would expect to continue through the night (ceiling of 400 feet, overcast, visibility one mile, light rain and fog; nor with ceiling of 500 feet, scattered clouds, 1,100 feet broken overcast, visibility three miles). Dr. Cutter testified in relation to the official weather report the arrival of a weather front perhaps contemporaneous with Seifert's departure, he would not attempt such a flight visually. (Weak cold front, expected Boise-Reno-King City line by 11 p.m., mostly 800 to 1,500 feet broken cloud, to overcast, with 2,000 to 4,000 feet broken to overcast layers along coastal sections with visibilities locally two to four miles, light rain and fog following frontal passage.)

Dr. Cutter, knowing the hills and the area, testified that even with an 1,100-foot ceiling, the ceiling would run into the hills, and visual flight over them probably would be impossible, and flight between the two airports would not be possible without penetrating clouds; and accordingly, it would be reckless and foolhardy to attempt such a flight visually; the probability of crashing being approximately 100 percent shortly after takeoff.

Defendant's expert, Dr. Carney,[8] testified he wouldn't recommend that anyone without instrument training fly into a cloud; that he had flown into clouds unexpectedly and was glad he was instrument trained. Likewise, he testified that at night with 1,100-foot overcast ceiling with no holes one could not fly visually from Half Moon Bay Airport to Palo Alto Airport, except by flying south. Mr. Goetz said under the same conditions, one could not make a visual flight; he would not have terrain clearance.

Captain Adams asserted that if Seifert penetrated clouds on the takeoff on the night in question, that alone would carry a 90 percent probability an accident would occur. Even on a clear night, with only his fatigue and lack of training, there was a 25 percent probability he would lose control of the aircraft. With between 400 and 900 feet overcast, wind and some drizzle, a plane piloted by one in Seifert's state of training and physical condition would have 100 percent probability of crashing soon after takeoff.

Testimony of conditions at ground level about the time of the departure from Princeton Inn presented some diversity.

Before considering further evidence bearing upon the crash and its

---

[8]Defense witness William R. Carney, M.D., treated Seifert professionally and was a pilot with 1,000 to 1,500 hours experience in the Army Air Force. Quitting in 1948, he resumed flying as a hobby in 1961 accumulating 200-300 hours of officially logged time, mostly in single engine airplanes, small light aircraft and a little in twin engine aircraft.

causes, we will consider the aviation guest statute, Public Utilities Code section 21406.

## II

Respondent administratrix successfully asserted upon the trial that Joseph Mittelman and Edna Mittelman at the time of their deaths were guests in the airplane, and Seifert was not chargeable with wilful misconduct; and therefore appellants were barred from recovery under California Public Utilities Code section 21406.[9] Appellants contend that denial of their request for instructions that as a matter of law their deceased parents were "passengers," and not "guests," under the terms of the statute was prejudicial error; and that likewise the failure to instruct that Seifert was chargeable with wilful misconduct under the terms of the guest statute was prejudicial error, as was the denial of their motion for judgment notwithstanding the verdict, on the issue of liability.

■ (1) Appellants' first contention, that the section is unconstitutional, for want of due process and equal protection of the laws, is not tenable. These issues have been determined to the contrary in relation to the comparable automobile guest statute, in *Silver* v. *Silver* (1929) 280 U.S. 117 [74 L.Ed. 221, 50 S.Ct. 57, 65 A.L.R. 939]; *O'Donnell* v. *Mullaney* (1967) 66 Cal.2d 994, 999 [59 Cal.Rptr. 840, 429 P.2d 160]; *Patton* v. *La Bree* (1963) 60 Cal.2d 606 [35 Cal.Rptr. 622, 387 P.2d 398]; *Ferreira* v. *Barham* (1964) 230 Cal.App.2d 128 [40 Cal.Rptr. 739].

■ (2) Appellants' further contention is that Public Utilities Code section 21406 is invalid because of an asserted conflict with 14 Code of Federal Regulations section 91.9: "No person may operate an aircraft in a careless or reckless manner so as to endanger the life or property or [*sic*] another."

The argument is advanced that there is an implied federal right of action, created by any breach of section 91.9; and that by limiting recovery under Public Utilities Code section 21406, there is an unlawful attempt to cut down the federal right. There are two false assumptions underlying this

---

[9]Public Utilities Code section 21406 provides: "A guest riding in or upon any aircraft without giving compensation, . . . does not have any right of action for civil damages against the airman flying the aircraft or against any other person otherwise legally liable for the conduct of the airman, on account of . . . the death of, the guest during such ride, unless the plaintiff in the action establishes that the . . . death proximately resulted from the intoxication or wilful misconduct of the airman."

Public Utilities Code section 21404 provides: "Subject to Section 21406, the liability of the owner or pilot of an aircraft carrying passengers for injury or death to the passengers is determined by the rules of law applicable to torts on the land or waters of this state, arising out of similar relationships. . . ."

argument. The first is, that the plaintiffs are persons whose life or property has been endangered.

In *Buckley* v. *Chadwick* (1955) 45 Cal.2d 183, 192 [288 P.2d 12, 289 P.2d 242], the Supreme Court held in a comparable wrongful death action, that "The plaintiffs are not persons injured as contemplated by the statute; they are persons who have suffered consequential damage ensuing from the death of the person injured," limited to pecuniary loss resulting from their economic relationship to the deceased.

The second unwarranted assumption is that breach of a federal aviation regulation resulting in death impliedly creates a right of action for wrongful death. There is a federal statute, relating to death on the high seas; but the federal aviation statute otherwise expressly provides for the application of state law (49 U.S.C.A. § 1506), as noted in *Loma Portal Civic Club* v. *American Airlines, Inc.* (1964) 61 Cal.2d 582, 592-593 [39 Cal.Rptr. 708, 394 P.2d 548]; *Wiener* v. *United Air Lines* (S.D.Cal. 1964) 237 F.Supp. 90, 92; *United Air Lines, Inc.* v. *Wiener* (9th Cir. 1964) 335 F.2d 379, certiorari dismissed 379 U.S. 951 [13 L.Ed.2d 549, 85 S.Ct. 452]; 7 Cal. Jur.2d Rev., Aviation, pages 218-220; *Rosdail* v. *Western Aviation, Inc.* (D.Colo. 1969) 297 F.Supp. 681, 684; *Rogers* v. *Ray Gardner Flying Service, Inc.* (5th Cir. 1970) 435 F.2d 1389, which emphasizes the distinction between commerce clause regulation and admiralty jurisdiction; *Hays* v. *Morgan* (5th Cir. 1955) 221 F.2d 481, 482.

In *Rosdail, supra,* at page 684, it is aptly noted that wrongful death actions require the statutory framework which only state law provides. (Cf. *Shell Oil Co.* v. *State Bd. of Equal.* (1966) 64 Cal.2d 713, 727 [23-25] [51 Cal.Rptr. 524, 414 P.2d 820] as to state power, app. dism. 386 U.S. 211 [17 L.Ed.2d 870, 87 S.Ct. 973].)

Violation of the federal or state provisions would have been the basis for imposition of penalties upon the offending airman Seifert, had he survived the catastrophe. (49 U.S.C.A. § 1471, subd. (a), subsec. (1); Pub. Util. Code, §§ 21408, 21407.5, 21019, 21407.6, 21409.)

By their explicit terms, these sections are operative no matter who may be a rider nor what property is involved; regardless of whether or not there is a civil remedy, or a guest statute or a statutory remedy for wrongful death. Any violation of these sections did not "endanger the life or property" of either of these appellants.

Therefore, the guest statute as construed in wrongful death actions does not impinge at all upon the stated regulation.[10]

---

[10]The case of *Blevens* v. *Sfetku* (1968) 259 Cal.App.2d 527 [66 Cal.Rptr. 486], inspired appellants' contentions in this regard. The court therein, in finding that the

The so-called guest statutes are explained, on the basis that suits by a rider against his host are a "breach of hospitality"; and that it is necessary to prevent collusive suits between host and guest against insurance carriers. The guest statutes had some parallel originally with the relative immunity of the host from liability to the social guest on his premises. This has been removed from California law. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 119 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) It takes mental gymnastics of which we are not capable to find collusion in an airplane crash, fatal to both a pilot and his rider. Though cogent reasons are urged by legal writers, seconded by appellants, why guest statutes should be abrogated, we are confronted by the statute, which must be honored. (*Olson* v. *Clifton* (1969) 273 Cal.App.2d 359, 370 [78 Cal.Rptr. 296].)

The power of the Legislature to prescribe and limit recoveries permitted under the wrongful death statute is well established. (*Moxon* v. *County of Kern* (1965) 233 Cal.App.2d 393, 397 et seq. [43 Cal.Rptr. 481]; *Treat* v. *Los Angeles Gas etc. Corp.* (1927) 82 Cal.App. 610 [256 P. 447].) The wrongful death provisions, Code of Civil Procedure section 377, and Public Utilities Code section 21406, must be read together, as if parts of a single statute. (*Pesce* v. *Dept. Alcoholic Bev. Control* (1958) 51 Cal.2d 310, 312 [333 P.2d 15].) Suits for death in intrastate flight are governed by California law. (See *Gordon* v. *Reynolds* (1960) 187 Cal. App.2d 472, 478 [10 Cal.Rptr. 73], and cases cited; cf. *Southeastern Aviation, Inc.* v. *Hurd* (1962) 209 Tenn. 639 [355 S.W.2d 436], app. dism. 371 U.S. 21 [9 L.Ed.2d 96, 83 S.Ct. 120].)

(3) On the fatal trip, were Mittelmans "guests" or "passengers"? Maximart was a discount house, opened in Palo Alto in 1961, in which 13 concessions were leased out. Joseph Mittelman was president and Edna Mittelman was vice-president of Maximart. With Mr. R. V. Smith his floor manager, Mittelman operated Maximart, while his equal in the business, Mrs. Mittelman, operated their retained concession, dealing with jewelry and luggage. Maximart was open on Sunday from 11 a.m. to 6 p.m., Saturdays 10:30 a.m. to 7 p.m., and on other days from 10 a.m. to 9 p.m. After closing time, it took from 15 to 30 minutes to close the store, and upon occasions, even longer. Mittelmans never left the store before closing.

---

California motorboat guest statute was invalid because of an asserted conflict with federal motorboat regulations unaccountably did not note that the federal act did not apply to inland waters, but only to motorboats using the high seas (46 U.S.C.A. § 526u) and that the federal acts provided likewise that nothing therein shall interfere with, abrogate or limit the jurisdiction of any state (*Idem*, § 527h, subd. (4)) in regulating use of undocumented vessels.

Likewise, the plaintiff there, towed involuntarily by an enmeshing trailing rope, was neither passenger nor guest. (Cf. *Boyd* v. *Cress* (1956) 46 Cal.2d 164 [293 P.2d 37]; *Rocha* v. *Hulen* (1935) 6 Cal.App.2d 245 [44 P.2d 478].)

Charles Seifert was both an attorney and a certified public accountant, and Maximart provided over one-half of his business, and took one-half of his office time. Mittelmans regarded him as a very brilliant lawyer and business adviser. They had daily telephone conferences. He came into Maximart many times a week. There were meetings almost nightly, involving the leases. Their business was usually conducted over dinner, following the closing of Maximart. Manager Smith stated it was very commonplace to plan such a meeting after 9 o'clock at night; some weeks, this was every night. The main place for such dinner meetings was Dinah's, in Palo Alto, but they also would go to the Normandy in San Francisco. Said daughter Linda Mittelman, "They would do a lot of business over dinner . . . during the evening . . . they would go to different restaurants. . . . Just wherever there was a good restaurant." There were discussions with Seifert about tenants in, tenants out, the opening of a new department, or plans for expansion, almost on a daily basis. Being an equal in the business, Mrs. Mittelman was rarely absent from such business discussions with Seifert.

On this day of the flight to Half Moon Bay, Seifert's secretary, Mrs. Modro, testified he worked all day on a big project for Mittelmans. Defendant Mrs. Seifert testified that on that day Mittelman and her husband were discussing a new corporation for the jewelry department. Mrs. Modro also testified he had opened an Anaheim office, with some business for Mittelman there. In the week preceding, he had made two trips there on business with Mittelman, flying the Apache plane. There were plans for Mittelmans to expand to Orange or Santa Ana, Fairfield and Lake Tahoe, stated R. V. Smith, Maximart floor manager; and Mr. Lewis Perry, at time of trial president of Maximart, testified Mittelman wanted to develop the jewelry business in Big A, or Murray Manor, Anaheim. Mittelman sought to set up an expanded line of credit for his jewelry venture with Mr. Perry, who was a factory representative, about 10 days before the crash. Smith testified Seifert and Mittelman were discussing future layouts for expanding at Fairfield or southern California.

Previously, Seifert had flown Mittelman to Half Moon Bay, to the Nut Tree near Fairfield and back to Palo Alto, as well as taking him on the two air trips to Santa Ana.

Mrs. Seifert had occasional social contacts with the Mittelmans, but they never discussed business in her presence. About a week before March 18, Mrs. Mittelman, in a note to Mrs. Seifert, proposed that on that date they would let the men take them out to dinner.

On the day in question (March 18) a noon meeting was set up for Seifert, Mr. Mittelman and Mrs. Mittelman at the store, to discuss the plans

for a jewelry development in the southern part of the state, Orange County. Mrs. Mittelman went out at noon and came back late for this appointment. After waiting to 1:30 p.m. Seifert said he had an appointment; he had to go, they would discuss and finish the business later on that evening. This meant, after 9 p.m. because Mittelmans never left the store until after closing.

Having arrived from a court reporter's school in San Francisco, Mrs. Seifert called her husband's office about 4:30 p.m. Later, he returned the call. She said they might have discussed a departure time, and what she should wear. She did not know the nature of the trip, whether it was to be strictly business or pleasure or both. She didn't know they were going to Half Moon Bay, only that they were going somewhere in the plane.

At 8 p.m., he called from the hospital, where he had taken a will for execution. Apparently she was advised the trip was going to be late, for she decided not to go along. She did not feel any necessity to cancel out with or to give her excuses to Mrs. Mittelman who had invited her; but left that to Mr. Seifert. Mrs. Seifert had never had any social contacts with Mrs. Mittelman alone.

Mr. Seifert sometime in the evening had called to the Princeton Inn at the Half Moon Bay Airport, and made a reservation for four, to arrive at from 10:30 to 11 p.m. Waitress Reed received the reservation. She and Maitre d' Salet testified Mittelmans and Seifert came in at 10:30 p.m., and they were still there at 1:50 a.m. Saturday, March 19, when the bright lights were turned on, preliminary to closing. The band had left at 1 a.m. The Mittelmans and Seifert came so late that there was a considerable delay in serving dinner, since the regular cook had already left. They did not dance; they said they were not there for dancing, that would await another time. They chatted with waitress Mannon during the evening. Mittelman identified himself and the Palo Alto business, Seifert stated he was the pilot of the plane, and Mittelman introduced Seifert as their attorney, and said "they had been out on business." This, of course, was not decisive as to whether or not it had been concluded.

Waitress Mannon testified that the Mittelmans and Seifert were serious the whole time, Mrs. Mittelman didn't say over five words all evening; they seemed to be discussing business; they stopped their conversations abruptly whenever she approached; they had a typewritten paper before them which Seifert put in his pocket when she came around. Salet said (with the lights low) the tables were no place for reading, but that the parties talked all evening. Waitress Reed testified they were discussing business, jewelry business, and that Seifert did most of the talking. He did not wear glasses at any time.

After the crash, there were papers blowing all about. Seifert's briefcase was never found. He had started to the office with it Friday morning. Among the few papers retrieved from the wreckage of the aircraft was a document describing the tax advantages of a business aircraft.

Defendant's expert witness Goetz testified that he sold Seifert both the Cherokee and the Apache planes. "About a month later [after purchase of the Cherokee] he came back in to see me and discussed the obvious advantage of a multi aircraft for the type of flying he was doing. And I in turn took the Cherokee back in trade on an Apache. Q. What type of flying was he doing? A. He was commuting between the Palo Alto and Orange County Airport, as near as I knew. It was my understanding he had an office in Santa Ana or some place close to Orange County."[11]

The court's instruction concerning the "passenger," as opposed to the "guest" relationship correctly stated that there must be a "tangible benefit . . . which is a motivating influence for furnishing the [rider's] transportation" flowing to the pilot. (*Nevarez* v. *Carrasco* (1969) 1 Cal.3d 518, 522 [82 Cal.Rptr. 721, 462 P.2d 577].) But this was followed by an instruction which specified that "a motivating influence" had to be *"a chief inducement"* for the transportation. (Italics added.) This was prejudicial error, which alone would require reversal of the judgment, under the circumstances here. (*Bozanich* v. *Kenney* (1970) 3 Cal.3d 567 [91 Cal.Rptr. 286, 477 P.2d 142].)

The error was understandable, in view of the diverse statements found in the decisions before *Bozanich* v. *Kenney*.

Since this issue was submitted to the jury under an erroneous instruction, the general verdict cannot be deemed to support the judgment in respect to other issues, such as wilful misconduct, tort liability or damages. (*Huebotter* v. *Follett* (1946) 27 Cal.2d 765, 771 [167 P.2d 193].)

There is no question that this excursion started out with a social motif; though it was not Seifert, as host, inviting the Mittelmans, but the converse. Perhaps the noontime business conference was to clear the decks; but it aborted, and was put over until later. It is arguable that the social excursion ended when Mrs. Seifert canceled out; and it is inferable that she may have been induced to do so, because the important business of the day still was

---

[11] Was Seifert demonstrating the utility of the plane for the proposed expanded operations, with the hope of inducing his clients, the Mittelmans, to purchase it? He had flown Mittelman in it to Santa Ana; now Mrs. Mittelman, also involved in the business, was to ride in it. (Cf. *Riley* v. *Berkeley Motors Inc.* (1934) 1 Cal.App.2d 217 [36 P.2d 398].)

According to Mrs. Seifert, the Seiferts could not afford such a $16,000 plane. Mittelman was interested in learning how to fly.

to be resolved; and she never was included in any of Mittelmans' business discussions.

Appellants' thesis then is that according to their habitude, the Half Moon Bay dinner was a business conference, like so many held over the dinner table theretofore, and that the undisputed evidence shows that the benefit to Seifert, arising from the attorney-client relationship, was a sufficient motivating influence to render the Mittelmans "passengers" under the aviation guest statute. (*Bowman* v. *Collins* (1960) 181 Cal.App.2d 807, 813 [5 Cal.Rptr. 776]; *McCann* v. *Hoffman* (1937) 9 Cal.2d 279, 284 [70 P.2d 909].)[12]

But the defendant contends that the Princeton Inn gathering was solely social. The thesis is, that the business postponed at noon could have been completed at Seifert's office before the flight was made;[13] and despite the mention of their jewelry business at the Princeton Inn, it was not a motivating factor in the aerial flight. However weak the contention may seem, opposed by the strong evidence to the contrary, our appellate role demands that we hold the status of Mittelmans as passengers cannot be declared as a matter of law. (*Winn* v. *Ferguson* (1955) 132 Cal.App.2d 539, 542-543 [282 P.2d 515]; cf. *Halbert* v. *Berlinger, supra,* 127 Cal.App.2d 6, 19.)

(4) Death proximately resulting from intoxication of the airman removes the guest statute limitation. (Pub. Util. Code, § 21406, *supra,* at

[12]We are cognizant that the guest statute is construed strictly against the host. (*O'Donnell* v. *Mullaney, supra,* 66 Cal.2d 994, 997.) The term "guest" is defined narrowly, and the term "compensation" is defined broadly. (*McCann* v. *Hoffman, supra,* 9 Cal.2d 279.) If a business conference was conducted, the attorney-client relationship existing, it could be considered for their mutual advantage, and Seifert's "compensation" of a practical tangible nature (*Whittemore* v. *Lockheed Aircraft Corp.* (1944) 65 Cal.App.2d 737 [151 P.2d 670]) would remove the Mittelmans from the guest category. (*Tucker* v. *Landucci* (1962) 57 Cal.2d 762, 766 [22 Cal. Rptr. 10, 371 P.2d 754]; *Thompson* v. *Lacey* (1954) 42 Cal.2d 443, 446-447 [267 P.2d 1]; *Martinez* v. *Southern Pacific Co.* (1955) 45 Cal.2d 244, 250-251 [288 P.2d 868]; cf. *Halbert* v. *Berlinger* (1954) 127 Cal.App.2d 6, 16-17 [273 P.2d 274].) There is an implied agreement to pay the attorney reasonable value of any services to a client. (*Trafton* v. *Youngblood* (1968) 69 Cal.2d 17, 26 [69 Cal.Rptr. 568, 442 P.2d 648].) Seifert did not give away his services. For instance, when daughter Linda Mittelman contemplated going to law school, she was sent to Seifert for advice, and Mr. Mittelman was billed for it. On March 18, the very day of the trip, when the noon meeting with the Mittelmans came to naught when Mrs. Mittelman did not appear before Seifert had to leave, Seifert picked out some luggage and Mr. Mittelman said, " 'Well, this will take care of your troubles this morning seeing that we didn't have a meeting.' "

[13]Compare *Gosselin* v. *Hawkins* (1950) 95 Cal.App.2d 857, 861 [214 P.2d 110]. Opposed to any such assumption is the evidence that Mittelmans closed the store at 9 p.m., that 20 to 25 minutes and sometimes more thereafter usually were required; taking the car, and assuming a change to Seifert's at his office; then a ride to the Palo Alto Airport, and enplaning and takeoff; and the 20- to 25-mile flight to the Half Moon Bay Airport; landing, and walking to the inn, all prior to 10:30 p.m.

fn. 9.) As an independent ground, plaintiff withdrew this issue from the case, but was entitled to and did urge the effect of alcoholic beverages, under the issue of wilful misconduct; and was entitled to an instruction relative thereto, had it been requested (*Hallman* v. *Richards* (1954) 123 Cal.App.2d 274, 282 [266 P.2d 812]; *Fuller* v. *Chambers* (1959) 169 Cal.App.2d 602, 605 [337 P.2d 848]) so as to avoid any confusion; here at least evident in the colloquies between court and plaintiffs' counsel on the subject. Wilful misconduct has been held to be established by evidence of driver fatigue when a driver had been awake continuously for 20 hours and consumption of a number of beers. (*Williams* v. *Carr* (1968) 68 Cal.2d 579, 588-589 [68 Cal.Rptr. 305, 440 P.2d 505].)

(5) We turn to consideration of the issue of wilful misconduct.

### III

■ Violations of any applicable aerial flight rules, state or federal, are considered only as they bear upon the existence of negligence or wilful misconduct. (*Dennis* v. *Southeastern Aviation, Inc.* (E.D.Tenn. 1959) 176 F.Supp. 542; cf. *United States* v. *Schultetus* (5th Cir. 1960) 277 F.2d 322, 325, cert. den. 364 U.S. 828 [5 L.Ed.2d 56, 81 S.Ct. 67]; *Hays* v. *Morgan, supra,* 221 F.2d 481; cf. *Andersen* v. *Bingham & G. Ry. Co.* (10th Cir. 1948) 169 F.2d 328, 330 [14 A.L.R.2d 987].) The declarations of Public Utilities Code sections 21404 and 21407 are to this effect.

As to any matter not covered by specific law or applicable regulation, the general law of negligence applies. (*Parker* v. *James Granger, Inc.* (1935) 4 Cal.2d 668, 677 [52 P.2d 226], app. dism. 298 U.S. 644 [80 L.Ed. 1375, 56 S.Ct. 958].)

Violations of statutes or rules having the force of law when coupled with circumstances may constitute wilful misconduct. (*Jones* v. *Ayers* (1963) 212 Cal.App.2d 646, 650-651 [28 Cal.Rptr. 223]; *Dodds* v. *Bucknum* (1963) 214 Cal.App.2d 206, 210 [29 Cal.Rptr. 393].)

■ "Wilful misconduct means intentional wrongful conduct, done either with knowledge that serious injury to the guest probably will result or with a wanton and reckless disregard of the possible results." (*Goncalves* v. *Los Banos Mining Co.* (1962) 58 Cal.2d 916, 918 [26 Cal.Rptr. 769, 376 P.2d 833].) Such knowledge, and wantonness and recklessness can be implied. The probability of serious injury or death is the probability apparent to a person of ordinary prudence and intelligence. (*Erickson* v. *Vogt* (1938) 27 Cal.App.2d 77 [80 P.2d 533]; *Wright* v. *Sellers* (1938) 25 Cal.App.2d 603, 613 [78 P.2d 209], fact that the defendant thought he

was driving safely, and had no intention to cause an accident or to injure his rider does not of itself absolve a driver from wilful misconduct.)

■ In determining whether the pilot of a plane is guilty of wilful misconduct, his entire course of conduct is to be considered. (*Hallman* v. *Richards, supra,* 123 Cal.App.2d 274, 281; *Meyer* v. *Blackman* (1963) 59 Cal.2d 668, 677-678 [31 Cal.Rptr. 36, 381 P.2d 916].)

Therefore, we proceed to review that of Seifert as bearing upon the fatal 19th of March; with the rules applicable to such review in mind.

■ The testimony of experts of course is competent even though it embraces their opinions on the ultimate facts in issue (Evid. Code, § 805). Their uncontradicted testimony upon matters of expert knowledge is conclusive. ■ The circumstances do not permit a reasonable doubt that pilot Seifert was chargeable with wilful misconduct upon the occasion in question, proximately contributing to the death of the Mittelmans. The jury was not free to disregard such testimony, and it is proper to resolve the issue here as a matter of law. (*Lysick* v. *Walcom* (1968) 258 Cal. App.2d 136, 156 [65 Cal.Rptr. 406, 28 A.L.R.3d 368]; *Goodwin* v. *Goodwin* (1935) 5 Cal.App.2d 644, 646-647 [43 Cal.Rptr. 332]; cf. *Winn* v. *Ferguson, supra,* 132 Cal.App.2d 539, 543.)

The Mittelmans did not know how to fly. They relied upon Seifert's judgment in this, as in their business affairs. We concur in the views expressed by the trial judge that there was no substantial evidence that there was any contributory negligence or assumption of risk on their parts, and denial of instructions on these points was proper.

(1) As an ensign, Seifert had been a licensed Navy pilot. His last flight with the Navy occurred on August 10, 1949. In February 1966, he was reissued a license to operate an aircraft by the Federal Aviation Agency based on his previous Navy license. He was not required to undergo any testing, examination or study to qualify for the license in 1966, except to secure the second class medical certificate.

The fatal catastrophe occurred some 37 days after he resumed flying. On February 10, he purchased a Piper Cherokee single-engine plane from Nystrom Aviation. A month later, 10 days before the crash, he traded this in for the twin-engine Piper Apache PA 23-150 for some $16,000. As for twin-engine aircraft operation, Seifert in the Navy accumulated a total of 11.7 hours flying in a DC-3 twin-engine aircraft. His solo time in all aircraft was 189.4 hours. He flew as passenger, student, pilot or copilot during his naval career on all types of aircraft a total of 955.49 hours. Upon resuming flying in 1966, because of his intervening lack of flying experience for about 17 years, he was regarded by his instructors as a beginning pilot.

Defendant's expert Carney testified that qualification to fly naval aircraft years ago does not necessarily qualify one to operate civilian aircraft. Dr. Cutter testified one does not pick up where one left off original training. Also, in changing from a single-engine to a dual-engine aircraft, one must have additional training. In this process, Captain Adams stated he would be afraid a former DC-3 pilot would be careless, thinking the civilian aircraft is just a toy alongside the other.

Dr. Carney testified he ceased flying in 1948; that when he resumed flying in 1961, he was "rusty," had to go through the whole training process as if he had never flown before; that the new navigational facilities and instruments are the chief stumbling blocks, and that it took 10 to 15 hours before the Federal Aviation Authority (FAA) was satisfied with his performance with instruments. This followed renewal of basic flying proficiency regained in 10-15 hours. Carney was qualified for instrument flight. Dr. Carney stated that after Seifert resumed flying, "I cautioned him about the difference in the navigational system, principally, and that he should be certain to get his instrument rating." He testified as a defense expert that 14 hours of instruction was necessary for transition from a single-engined plane (like the Cherokee) to a twin-engined plane (like the Apache). So did defendant's expert Goetz.

As part of the consideration of the purchase of the plane, Seifert was offered 15 hours of free flight instruction time in the operation of the Apache twin-engine aircraft. This was deemed necessary for proper familiarization. As of March 11, he had received only a total of 5.3 of the 15 flight hours. Captain Adams, his instructor, was not satisfied with Seifert's performance. Some items relating to "Emergency procedures" were not checked off, probably because Adams thought he should have more time on those particular items. The list of such procedures applicable to the Apache plane is extensive, as shown in the flight manual. 14 Code of Federal Regulations section 91.6, provides in part, "(a) No person may operate a civil aircraft in a Category II operation unless— . . . (2) Each flight crewmember has adequate knowledge of and familiarity with, the aircraft and the procedures to be used by him." Instruction is required; mere time in the air does not give competency, stated Captain Adams.

14 Code of Federal Regulations section 91.34, provides no one shall operate a civil aircraft in this category unless a manual for the aircraft is carried and "(2) The operation is conducted in accord with the procedures, instructions, and limitations in that manual."

Captain Adams testified that as of the date of his last instruction, Seifert did not have sufficient flight proficiency to qualify him to carry passengers,

either in daytime or at night. Forty hours of flight time with the plane is requisite and fifty hours in urban areas. Seifert's last instruction was about one week before the accident. Adams indicated that although Seifert had accumulated a flight total of about 12 hours, both dual and solo in the twin-engine Apache between March 11 and the accident, in his opinion Seifert's flying ability would not have improved after the instruction given without further dual flying instruction.

Defense expert Goetz testified that he would accept Captain Adams' opinion on Seifert's competency as a pilot. The defense is bound thereby.

(2) Seifert was not qualified for "instrument flight" under conditions of darkness or weather when visual flight was not safe.

On March 4, 11, 12 and 14, in 1966, Seifert entered in his private pilot's log actual instrument flying time while flying *solo,* although he was not an instrument rated pilot. Before such rating, defense witness Goetz stated it is not legal to fly without an accompanying pilot for safety, which regulation Seifert ignored. A pilot may not legally fly an aircraft under instrument flight rules without the rating. Instrument flying involves flying an aircraft solely by reference to the flight instruments without being able to see the ground or horizon and requires an extensive period of training of a minimum of 20 hours and a FAA check ride. To stay proficient, recurrent training of at least six hours every six months is required. Flying under instrument flight conditions by a person who is not instrument rated is a clear violation of the federal aviation regulation prohibiting such flights.[14] In 1947, Seifert was denied certification for instrument navigation. Admittedly, he never thereafter received any certification at any time qualifying him for instrument navigation.

(3) Although the precise weather conditions at ground level were in dispute, both plaintiffs' and defense experts agreed that any attempted crossing of the coast range under the existing weather by a noninstrument-rated pilot presented extreme hazard.

Frank Silvestri, aviation expert, as an official licensed United States weather observer, made weather observations from the Half Moon Bay Airport for the Oakland Flight Service Center and the San Francisco International Airport for use by commercial and private pilots.

Silvestri made several entries of his weather observations in his log on

---

[14]14 Code of Federal Regulations section 91.105, provides no one may operate an aircraft under Visual Flight Rules outside controlled airspace unless there is flight visibility of one mile. At an altitude of 1,200 feet or less, the sky must be free of clouds. Between 1,200 and 10,000 feet above mean sea level, there must be one statute mile of visibility, at least 500 feet below clouds, 1,000 feet above and clear of them 2,000 feet horizontally.

Friday, March 18, commencing at one o'clock in the afternoon when the weather was clear with 15 miles' visibility. His entries for the afternoon at 4 p.m. showed steadily deteriorating weather conditions going from clear to broken clouds, visibility reduced to 7 miles; at 8 p.m. there was an estimated ceiling of 600 feet, overcast with a visibility of 3 miles in light rain and a barometer fallen from 30.11 at 1 p.m. to 29.94. At 10:30 p.m. the estimated ceiling was 400 feet, overcast, 1 mile visibility, light rain, fog, barometer 29.94. As of 2 a.m. on March 19, approximately the time of the crash, he stated it probably would have been about the same, but could have gone either way.

About 9 p.m. on the evening of March 18, Silvestri left the airport and went over to the Princeton Inn for dinner. It was about 200 yards from the airplane tiedown area to the inn. While there, the cocktail waitress pointed out a party of three persons who had flown in for dinner and identified Seifert as the pilot. They complained about the muddy conditions encountered when they walked from their plane to the inn. Silvestri returned to his airport office about 10:30 p.m., made his final weather observation as noted above. Because of prior private plane accidents at Half Moon Bay, he was in the habit of recording weather observations whenever he saw a plane on the airport runway and conditions were such as to suggest that an accident might occur. He did not say anything to Seifert and party about their complaint of mud on the airport or respecting weather flight conditions. He did not hear them take off nor had he seen them arrive. His written statement to the Civil Aeronautics Board was placed in evidence.

In reference to the fog, Silvestri's testimony was that the fog was solid, that he could not see the bases of the hills, which were all bathed in fog and that he could see 400 feet from the bases. He did not believe anyone would have attempted to come into the airport on March 18, even on instruments, from 9:30 to 10:30 p.m. He could not see how a man in his right mind could make an approach from above the clouds under visual flight regulations—he probably would be killed.

But Seifert did come in, and since he came in, this was argued as evidence he was able to get out. Expert Captain Adams testified that if there was a 400-900 foot ceiling, some drizzle and some wind, the chances are that Seifert would run into trouble as soon as he left the ground; and as soon as he progressed out of the takeoff path, as soon as he lost sight of the lights, or entered into a cloud, he would be in trouble.

The Half Moon Bay Airport does not have a control tower and is off a regular airway. It is subject to the visual flight rules (VFR), a specific set of rules for pilots who are not instrument rated, who must fly visually,

with a requirement that the sky be clear of clouds and horizontal visibility of one mile before any takeoff. Therefore, it would be legal (although not good judgment) for a pilot to take off with a 400-foot ceiling if there is a mile of horizontal visibility.

Expert Cutter said that 1,000-foot ceiling was the minimum, and so did defense expert Goetz who stated visibility should be three miles. A non-instrument-rated pilot could not legally fly over to Palo Alto even with a 1,000-foot ceiling. A prudent pilot would not attempt to take off under such circumstances, said Silvestri. Expert Cutter said a pilot who attempted to go from Half Moon Bay to Palo Alto with a 1,100-foot ceiling could not make this flight without penetrating clouds; if not instrument-rated, but O.K. in all other factors, his chances of losing control and crashing still would be practically 100 percent.

Defendant's expert Carney testified he wouldn't recommend that anyone without instrument training fly into a cloud; that he had flown into clouds unexpectedly and was glad he was instrument trained. Dr. Carney asserted that with an 1,100-foot ceiling, three miles visibility, light rain, one could safely fly avoiding clouds; but did not state one could safely fly above the 1,100-foot level, en route to Palo Alto.

At the approximately possible times of the accident, a cold weather front had moved into the San Francisco-Half Moon Bay area. Based on the weather observations of Moffitt Field and San Jose, introduced into evidence by the defendant, expert Cutter testified that the clouds would have been up against the mountain ranges on the ocean side of the peninsula. Accordingly, it would have been impossible to fly from the Half Moon Bay Airport to the Palo Alto Airport without entering those clouds. Expert Silvestri testified no noninstrument-rated person should fly an Apache in frontal weather. Concededly, Seifert was not so rated. In fact, he had been denied such a rating before he left the service.

(4) Failure to make required weather check.

Pursuant to 14 Code of Federal Regulations section 91.5, it is mandatory that a pilot familiarize himself with all available information concerning the flight, including available weather reports and forecasts prior to either an instrument flight or a flight in the vicinity of the airport. The flight from Half Moon Bay to Palo Alto was subject to Regulation 91.5. The customary procedure for compliance while on the ground at Half Moon Bay Airport is by telephone to the FAA Oakland Flight Service Center, as it is not possible to receive radio communication from local sources that would contain the latest information covering passage throughout the intended flight.

Seifert did not make any such telephone call from Princeton Inn, and the flight center had no record of any such call. The flight service would not give the specific Half Moon Bay weather condition, but would cover other points involved in such a flight. But if instrument flight was indicated, it would take control of the airplane movement. There is a Woodside station which could not be heard by radio unless the plane was up 1,100 feet.

(5) Flight pattern for takeoff.

It is provided by 14 Code of Federal Regulations section 91.89, "Each person operating an aircraft to or from an airport without an operating control tower shall . . . (3) In the case of an aircraft departing the airport, comply with any FAA traffic pattern for that airport."

Reference has been made to the FAA flight pattern established for the Half Moon Bay Airport, wherein the pilot *after attaining 800 feet altitude* was to make a right turn. The crash occurred in the attitude of the right turn at an altitude of 100-120 feet above sea level, as shown by the map exhibits, close to the end of the airport runway. An inference of negligence arises. (*San Diego Gas & Electric Co.* v. *United States* (9th Cir. 1949) 173 F.2d 92; *Southern Cal. Edison Co.* v. *Coleman* (1957) 150 Cal. App.2d Supp. 829, 831 [310 P.2d 504].) Mr. Preuss' observation placed the banking plane twice as high as the adjacent trees, elevation about 150 feet, slowly gaining altitude. Inspection of the map shows that the adjacent terrain would have been cleared on a right turn had the requisite altitude been obtained. According to defense witness Hadding, the plane previously landed on the airstrip, bouncing, the last time at a speed too fast to land, and started its turn east to the hills.

If the crash did not occur from a turn at too low an altitude, then from Preuss' testimony, the plane entered a cloud at low altitude, and the expert hypothesis is that there was loss of control from spatial disorientation, as both plaintiffs' and defendant's experts described it. Both could have happened together. The site of the crash was close to the end of the airport runway.

(6) Absence of required takeoffs and landings at night, before carrying passengers.

Under 14 Code of Federal Regulations section 61.47, subdivision (b), and as testified by defense witness Goetz, a pilot to be qualified to carry passengers on night flights, must (without passengers) have five takeoffs and landings to a full stop at night within the preceding 90 days, in an aircraft of the same type and category. Seifert did not comply with this

[Apr. 1971]

prior to the fatal trip. He previously had returned in flight with Mrs. Seifert from the Nut Tree without such previous compliance, after dark.

(7) It was reckless misconduct for one in Seifert's physical condition and fatigue to attempt a flight at night with passengers in a multi-engined airplane.

(a) As applied to a pilot, the testimony confirmed the obvious fact that fatigue reduces alertness and coordination, though its effect is relative.

On the morning of March 18, Seifert began his day around 7 a.m. and was active and busy running around throughout the day. If the accident occurred March 19, about 2:50 a.m., the time shown on the aircraft clock, he would have been awake and active for approximately 19-21 hours.

Seifert's personal physician, Dr. W. R. Carney, who testified for the defense, stated that Seifert, height 5 feet 8 inches, weighing about 250 pounds, was about 90 pounds overweight. This condition put a tremendous load on his heart and arteries and caused shortness of breath. The overweight condition also slowed him down and caused him to become more easily fatigued.

Dr. Carney gave as his expert opinion that a person with Seifert's physical condition under the circumstances disclosed here would be extremely tired so that a takeoff at night in a multi-engine aircraft would be risky and dangerous.

Dr. A. W. Cutter, expert pilot, specialist in aviation medicine and senior FAA medical examiner, testified that a large individual awake for 19-20 hours would have a fairly high degree of fatigue. Drink and a meal (Seifert had both at the Princeton Inn) would add to it. A pilot shouldn't eat a heavy meal. A cold would add to fatigue. If one is awake for 20-21 hours, reaction time is markedly prolonged, from half again to twice as long. There is deterioration of judgment; an inability to think clearly, a likelihood of spatial disorientation and of developing vertigo.

The regulation, 14 Code of Federal Regulations section 61.45, provides: "No person may act as a pilot in command . . . while he has a known physical deficiency, or increase of known physical deficiency, that would make him unable to meet the physical requirements for his current medical certificate."

Seifert held a second class medical certificate, which required that he be free from any "disease or malformation of the nose or throat that might interfere with, or be aggravated by, flying." (14 C.F.R. § 67.15, subd. (c), subsec. 5.)

FAA examiner Dr. Cutter testified that the presence of a cold and symptoms was disqualifying under these provisions, requiring, for instance, the grounding of airline pilots until complete recovery.

It seems undisputed that down to the fatal morn, Seifert was still experiencing the end effects of a cold. Defendant Mrs. Seifert testified he had his cold, and still was coughing; earlier in the week she asked him not to go to work but "he was too busy to stay in bed." He had a very bad cold and was out a couple of days. He called into the office to say he was sick on the 10th or 11th. Mrs. Natalie Modro, his secretary, testified he talked about his cold a lot all week, he mentioned that it was very bad and he made a big thing out of it. On March 11, he was flying in spite of his cold. He coughed, sounding like a cow. He said he was taking something for the cold, the doctor was giving him pills for it. She was surprised he was flying with a cold, because one is not supposed to fly with a cold. Mrs. Modro testified that on March 18, he still complained of his cold.

The Monday after the crash Mrs. Modro found a bottle of light-colored pills, a couple of inches tall, half-empty, in his desk. She had never noticed any other medication around the office at any time. It was labeled "Dexa-something," a Santa Ana prescription by Dr. Charles W. Jefferies, whom Seifert had visited the previous weekend. Dr. Jefferies deposed that he might have given Seifert some antihistamines but he denied knowledge of the Dexa-prescription.

Dr. W. R. Carney, Seifert's personal physician, and defense witness, testified that he would proceed with caution in flying with antihistamines; they are within the FAA prohibition of drug use by pilots.[15] Antihistamines might induce drowsiness or mental confusion. Dexedrine and Dexamyl were testified to be antihistamines, but the bottle was not in evidence, and hence the precise drug therein was not identified. Dr. Carney deposed that Dexedrine was used for weight reduction, that it could produce euphoria, impairment of judgment; and temporarily could lessen the sense of fatigue; the rise in blood pressure could have minor effects on the pupil of the eye; and when the effect wears off, results in the sensation of greater fatigue and depression, and would affect a pilot in the area of judgment.

Dr. Cutter stated that the drug effect was such that even after Dristan, a pilot should not fly for 8-12 hours. Antihistamines produce drowsiness in some people and overstimulate others, stated Dr. Carney. Seifert's

---

[15] 14 Code of Federal Regulations section 91.11, subdivision (a): "No person may act as a crewmember of a civil aircraft while—(1) Under the influence of intoxicating liquor; or (2) Using any drug that affects his faculties in any way contrary to safety."

secretary stated that on March 18, Seifert acted "all revved up," more than usually active, and nervous.

(8) Antecedent use of alcoholic beverages.

Tests made by the coroner's office indicated that at the time of the accident, Seifert's tissue fluid had an average reading of .03 percent ethyl alcohol.

In the opinion of the autopsy surgeon, Dr. Arthur Roy Lack, such percentage derived from tissue would be only 70 to 75 percent of that which would have been present in the blood had it been possible to test it; or .042 or .04.

The toxicologist, James W. Brackett, Jr., defense witness, testified that a person having the amount of blood alcohol found in the test of Seifert's tissues would be "under the influence" to the extent he might feel a glow, or feel gay, or feel depressed, or feel moody or something like that. There was testimony showing Seifert kept and occasionally consumed liquor in his office; as well as that relating to the drinks at dinner in the Princeton Inn.

FAA Regulation 14 Code of Federal Regulations section 91.11, subdivision (a), subsection (1), forbids anyone to act as crewman of a civil aircraft while *under the influence* of intoxicating liquor. California Public Utilities Code section 21407.5, also provides: "It is unlawful for any person to operate an aircraft in the air, or on the ground or water, while under the influence of intoxicating liquor or narcotics."

Experts of both parties, Captain Adams and Dr. Carney, testified that the consumption of any alcohol within a 24-hour period prior to a flight impairs the pilot's ability to handle the aircraft.

Upon trial, the plaintiffs abandoned any contention that one who had consumed liquor to the extent the tests indicated was "intoxicated" as that word is used in the guest statute; but correctly maintained that this did not preclude one from being "under the influence of intoxicating liquor." (Consult *People* v. *Haeussler* (1953) 41 Cal.2d 252, 255, 262 [260 P.2d 8], cert. den. 347 U.S. 931 [98 L.Ed. 1082, 74 S.Ct. 533].)

The Supreme Court in *Williams* v. *Carr, supra,* 68 Cal.2d 579, held that wilful misconduct could be established by evidence of driver fatigue and consumption of beer. The use of intoxicants is one factor in wilful misconduct. (*Fuller* v. *Chambers, supra,* 169 Cal.App.2d 602, 605.)

Upon careful consideration, we now hold that "intoxication" as used in the aviation guest statute, Public Utilities Code section 21406, is,

by section 21407 of that code, to be defined *in pari materia* with 14 Code of Federal Regulations section 91.11, subdivision (a), subsection (1), as meaning "Under the influence of intoxicating liquor." If this is more restrictive than the application of the word "intoxication" under the automobile guest statute (Veh. Code, § 17158) it is impelled by the paramount federal regulation, 14 Code of Federal Regulations section 91.11, and justified by the special hazards of private aerial navigation. Expert testimony established that the use of any alcohol or drugs such as antihistamines affects coordination and reaction time and is forbidden by the regulations as a safety measure. Any use of alcoholic beverages within 12 hours of flight time is within the prohibition of 14 Code of Federal Regulations section 91.11, as administratively interpreted. Airlines have a 24-hour restriction.

(9) Failure to wear glasses, as required.

■ Seifert's medical certificate required him to wear corrective glasses while exercising the privileges of his pilot's license. He did not wear glasses during instruction.

The coroner picked up a clear pair of glasses, with broken lenses, still in their case, at the scene of the crash, and listed them in the property held by his office. They disappeared before the trial. No other glasses were found. There was no evidence of any contact lenses found on or about the remains. Smith, store manager, testified Seifert never wore glasses. There was considerable testimony that at his office on the day of the crash, and when Seifert was at, and when he left the Princeton Inn for the fatal flight, he was not wearing glasses. There was none that he did. This direct evidence is not rebutted by testimony he had once tried contact lenses; and that he had habitually worn his glasses of which he had had many pairs at home, in view of the eyewitness testimony as to 18-19 March. (*Whittemore* v. *Lockheed Aircraft Corp., supra,* 65 Cal.App.2d at p. 752; consult Evid. Code, §§ 1101, subd. (a), and 1104.)

(10) Wilful and wanton character of Seifert's conduct.

Both plaintiffs and defense experts testified that one with Seifert's naval aviation training would have been instructed in, and would fully appreciate the risks undertaken for his own safety and that of his passengers in flying in his state of training and physical condition and in adverse weather in the nighttime.

Since the flight record book shows his own entries of flight and flight time, it seems clear that Seifert's deficiencies of training and performance were well known to himself, but he persisted in flying the plane with passengers under such circumstances. His intent and wilfulness may be

implied. (*Cope* v. *Davison* (1947) 30 Cal.2d 193, 199 [180 P.2d 873, 171 A.L.R. 667].)

A reasonable pilot under the same circumstances would be aware of the dangerous character of Seifert's course of conduct. (*Chappell* v. *Palmer* (1970) 10 Cal.App.3d 71, 75 [88 Cal.Rptr. 710]; cf. *Erickson* v. *Vogt, supra,* 27 Cal.App.2d 77.) Seifert's course of conduct was with a wanton and reckless disregard of the possible results. (Cf. *Gillespie* v. *Rawlings* (1957) 49 Cal.2d 359, 367-368 [317 P.2d 601]; *Reuther* v. *Viall* (1965) 62 Cal.2d 470, 475 [42 Cal.Rptr. 456, 398 P.2d 792]; *Goncalves* v. *Los Banos Mining Co., supra,* 58 Cal.2d 916, 918; *American Airlines* v. *Ulen* (1949) 186 F.2d 529, 533 [87 App.D.C. 307].)

Statutory violations coupled with the other circumstances are sufficient to establish wilful misconduct. (*Jones* v. *Ayers, supra,* 212 Cal.App.2d 646, 650-651; *Dodds* v. *Bucknum, supra,* 214 Cal.App.2d 206.)

Seifert illegally logged "instrument flight time" (flying solo) when he was required for safety to have flown dual, prior to qualification. This was stated by expert Captain Adams to show Seifert's bad flying habits. Though minimal, he flew after drinking. He previously flew while suffering the peak of a disqualifying cold. He flew passengers after dark before accomplishing the necessary practice landings and take-offs. The disposition to disregard such safety regulations adequately appears.

The conclusion seems inescapable that Seifert's rash and wanton self-confidence brought him and his passengers to death. The Mittelmans did not know how to fly. Not being experienced pilots, they would not be able to appreciate the risks involved. They relied upon Seifert's judgment in this, as in their business affairs. We concur in the views expressed by the trial judge that there was no substantial evidence that there was any contributory negligence or assumption of risk on their parts, and denial of instructions on these points was proper.

We therefore hold that under the terms of the aviation guest statute and the established criteria, that Seifert was chargeable with wilful misconduct, as a matter of law.

## IV

If the aggregate of circumstances did not cumulatively establish wilful misconduct, still the doctrine of res ipsa loquitur applies. (*Parker* v. *James Granger, Inc., supra,* 4 Cal.2d 668, 673-674, app. dism. 298 U.S. 644 [80 L.Ed. 1375, 56 S.Ct. 958]; *Nelson* v. *American Airlines, Inc.* (1968) 263 Cal.App.2d 742, 745 [70 Cal.Rptr. 33]; *Smith* v. *O'Donnell* (1932) 215 Cal. 714, 722-723 [12 P.2d 933]; *Roberts* v.

*Trans World Airlines* (1964) 225 Cal.App.2d 344 [37 Cal.Rptr. 291]; *United Air Lines, Inc.* v. *Wiener, supra,* 335 F.2d 379; *Trihey* v. *Transocean Air Lines* (9th Cir. 1958) 255 F.2d 824, 829-830, cert. den. 358 U.S. 838 [3 L.Ed.2d 74, 79 S.Ct. 62].) The applicable conditions for applying the doctrine here were met. (*Keena* v. *Scales* (1964) 61 Cal.2d 779 [40 Cal.Rptr. 65, 394 P.2d 809].) An inference of negligence arose, imposing upon the defendant the obligation of going forward to rebut the inference, by (1) a satisfactory explanation of cause of the accident, in which no element of negligence of Seifert inhered; or (2) such case in all possible respects which would necessarily lead to the conclusion that the accident could not have happened from want of care, but was due to some unpreventable cause, though the exact cause is unknown. Such rebuttal must be by substantial evidence appealing to a fair and reasonable mind. The explanation must offer a definite cause for the accident in which the pilot's negligence does not inhere apart from mere speculation or conjectural evidence. "Where [as here] the res ipsa loquitur inference is properly drawn, an appellate court will set aside a defense verdict if there is no substantial evidence to rebut the inference." (*Roberts* v. *Trans World Airlines, supra,* 225 Cal.App.2d 344, 353.) Evidence of specific negligent acts or omissions does not deprive the plaintiffs of the benefit of the inference, so long as they do not rebut the inference, i.e., as long as the res ipsa loquitur inference still may be drawn. (*Borenkraut* v. *Whitten* (1961) 56 Cal.2d 538, 548 [15 Cal.Rptr. 635, 364 P.2d 467].) The inference of negligence raised by res ipsa loquitur may coexist with presumptions of negligence arising from evidence of Seifert's violation of regulations which have the force of law. (*Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 624 [327 P.2d 897].) The defendant had the burden of showing that what Seifert did might have been expected of a person of ordinary prudence, who desired to comply with the law.

Under these tests, defendant has not rebutted the inference of negligence arising under res ipsa loquitur nor the presumptions of negligence arising from violation of the FAA regulations; but in considerable degree, defendant's own witnesses established such negligence.

In order to meet the charge of wilful misconduct defendant's position was, that resolving all conflicts in Seifert's favor, pilot Seifert exercising ordinary care, under visual flight regulations, not under instrument flight regulations, could have safely flown over the mountains to Palo Alto; despite deficiencies in training, despite his physical, fatigued condition, despite the night, despite the weather, and despite any violation of FAA regulations.

The sad fact, is, that he did not. The inference is fully supported.

## V

Thus, we conclude that the inference of negligence under the doctrine of res ipsa loquitur was not rebutted; and that the undisputed evidence of the expert witnesses for defendant, and for the plaintiffs, reinforce the inference; and if contrary to our conclusion the evidence did not establish wilful misconduct as a matter of law, there is no substantial evidence to support a verdict that Seifert's negligence was not a proximate cause of the death of himself and his passengers. (Cf. *Reuther* v. *Viall, supra,* 62 Cal.2d 470, 474-475; *Moyer* v. *Dresch* (1934) 2 Cal.App.2d 655 [38 P.2d 849]; cf. *Trihey* v. *Transocean Air Lines, supra,* 255 F.2d 824, 829-830; *Druzanich* v. *Criley* (1942) 19 Cal.2d 439, 444 [122 P.2d 53]; *Morrison* v. *Townley, supra,* 269 Cal.App.2d 863 [75 Cal.Rptr. 274].)

The trial court erred in denying appellants' motion for a directed verdict on the issue of liability, and for judgment as to liability notwithstanding the verdict.

The judgment is reversed, with directions to the trial court to enter its minute order establishing defendant's liability, and thereafter, to proceed to try the remaining issue of damages, instructing the jury accordingly. (*Lauderdale* v. *U & I Equip. Co.* (1969) 271 Cal.App.2d 140, 143 [76 Cal.Rptr. 483].)

Shoemaker, P. J., concurred.

**TAYLOR, J.**—I concur in the reversal of the judgment pursuant to the error in the instruction on business purpose under the recently announced rule of *Bozanich* v. *Kenney,* 3 Cal.3d 567 [91 Cal.Rptr. 286, 477 P.2d 142]. However, I cannot agree that the judgment should be reversed with directions to enter a judgment in favor of plaintiffs on the ground that Seifert was guilty of wilful and wanton misconduct as a matter of law.

In arriving at the nine factors upon which they predicate their legal conclusion that Seifert committed wilful and wanton misconduct,[1] the majority has departed from the well established rule of appellate review. Where the evidence, though undisputed or without conflict, reasonably

---

[1](1) Seifert, a beginning pilot.
(2) Seifert not qualified for instrument flight.
(3) Any attempt to cross mountains under existing conditions extremely hazardous.
(4) Failure to note weather check.
(5) Takeoff flight pattern.
(6) Absence of required takeoffs and landings at night before carrying passengers.
(7) Physical condition and fatigue.
(8) Use of alcoholic beverage.
(9) Failure to wear glasses.

permits differing inferences, this court must accept those inferences supportive of the jury's verdict. The fact that inferences other than those which have been drawn by a jury may appear to an appellate tribunal to be more reasonable does not afford sufficient justification for disturbing the judgment on appeal (*Hamilton* v. *Pacific Elec. Ry. Co.,* 12 Cal.2d 598, 602 [86 P.2d 829]). I agree that the evidence here would have abundantly supported a jury's finding of wilful and wanton misconduct but no substantial authority has been cited to support such a determination as a matter of law at the appellate level. The jury, having heard all of the evidence, conflicting and otherwise, apparently rejected the conclusions and inferences upon which the majority opinion relies.

Wilful misconduct is defined as, first: the intentional doing of something with the knowledge that serious injury is a probable, as distinguished from a possible result; and, second, the intentional doing of an act with a wanton and reckless disregard of its possible result (*Meek* v. *Fowler,* 3 Cal.2d 420, 426 [45 P.2d 194]; *Morrison* v. *Townley,* 269 Cal.App.2d 863 [75 Cal.Rptr. 274]). Here, except for Seifert's lack of experience with the Apache and in night flying, and except for his lack of instrument rating, there are conflicting inferences to be drawn as to each of the other factors cited. For instance, as to the weather, one of the experts testified that given one of the possible times of takeoff and the then existing weather conditions, the plane could have made it without the use of instrument flying. Thus, the jury could have found that Seifert took off for Palo Alto pursuant to the visual flight conditions for which he was fully qualified and under which he could legally take off. Despite his earlier cold, Seifert felt well enough on the day in question to put in a full day at work, meet with the Mittelmans and proceed with the plans made for dinner. The presence of the pills in Seifert's desk drawer do not establish the fact that he took them on the fatal day. Although Seifert was served two drinks, a waitress testified that he consumed only between ⅓ and ½ of one drink. As to the failure to wear glasses, although Seifert was not wearing his glasses when the party left the inn, he could have put them on before the plane took off. The fact that a pair of his glasses were found in a case at the scene of the accident is not determinative, as he usually carried several pairs. After all, Mittelman was known to be wearing glasses at the party and yet his glasses were not found at the scene of the accident. There is no evidence that Seifert had a suicidal tendency and was bent on destroying himself, his wife, and his most important clients. I cannot find sufficient uncontroverted evidence to support a finding of wilful and wanton misconduct at the appellate level.

We must keep in mind that Seifert was licensed to fly his plane. Furthermore, despite his lack of experience in flying the Apache, he had

completed several flights, including some instrument flying. The jury, rather than inferring wilful and wanton misconduct on Seifert's part, may well have limited itself to the conclusion that FAA standards for relicensing former military pilots and controlling small airports are not sufficiently stringent.

In my view, the proper disposition of the case would be to reverse and order retrial of the liability issue under proper instructions as to business purpose and the applicable federal standard of ordinary care. I see merit in plaintiffs' argument that under the supremacy clause of the United States Constitution, the conflict between the standard of care required by the California statute and the higher standard set forth in the federal regulations must be resolved in favor of the federal law. Plaintiffs properly rely on *Blevens* v. *Sfetku,* 259 Cal.App.2d 527 [66 Cal.Rptr. 486], which held the California motorboat guest statute unconstitutional on the basis of such a conflict. There is a compelling convincing analogy between the federal government's control and regulation of maritime and motorboat safety and aviation and aircraft safety. There is an impressive line of authority holding that a regulatory statute containing penalties for its violation creates a civil right of action among the members of the class that the statute seeks to protect. (*Reitmeister* v. *Reitmeister,* 162 F.2d 691; *Wyandotte Co.* v. *United States,* 389 U.S. 191 [19 L.Ed.2d 407, 88 S.Ct. 379]; *Town of East Haven* v. *Eastern Airlines, Inc.,* 282 F.Supp. 507. For a discussion of the principle involved see *City & County of San Francisco* v. *Western Air Lines, Inc.,* 204 Cal.App.2d 105, 121-125 [22 Cal.Rptr. 216].) The argument that there can be no federal right of action for wrongful death in the absence of statute was recently negated by the United States Supreme Court in *Moragne* v. *States Marine Lines,* 398 U.S. 375 [26 L.Ed.2d 339, 90 S.Ct. 1772] which held that there was a nonstatutory cause of action in federal maritime law for wrongful death. It is my view that plaintiffs here have a federal cause of action and that the state's limitation of their right of recovery to situations involving intoxication and wilful misconduct violates the United States supremacy clause as it is inconsistent with the higher standard of care of ordinary negligence set forth in federal aviation regulation 91.9 and imposed for the protection of the life and property of all persons including guests. (Cf. *Roosevelt Field* v. *Town of North Hempstead,* 88 F.Supp. 177.)

The petition for a rehearing was denied May 21, 1971. Taylor, J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied June 23, 1971.